DECISION
{¶ 1} Relator, United Foundries, Inc., has filed this original action requesting that this court issue a writ of mandamus ordering respondent the Industrial Commission of Ohio ("commission") to vacate its award to respondent Richard Crnarich ("claimant") for relator's violation of a specific safety requirement ("VSSR").
 {¶ 2} This matter was referred to a magistrate of this court, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) Relator has filed objections to that decision.
 {¶ 3} In its objections to the magistrate's decision, relator fails to explain how the magistrate erred and merely reiterates the same arguments it presented to the magistrate. We have reviewed the magistrate's decision and the record, and we agree with his well-reasoned explanation and final determination.
 {¶ 4} After an examination of the magistrate's decision, an independent review of the record, pursuant to Civ.R. 53, and due consideration of relator's objections, we overrule its objections and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and deny relator's request for a writ of mandamus.
Objections overruled; writ of mandamus denied.
PETREE, P.J., and BRYANT, J., concur.
 IN MANDAMUS {¶ 5} In this original action, relator, United Foundries, Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its award to respondent Richard Crnarich ("claimant") for relator's violation of a specific safety requirement ("VSSR").
Findings of Fact:
 {¶ 6} 1. On June 24, 1999, claimant sustained severe injuries while employed as a set-up molder for relator.
 {¶ 7} 2. Claimant's timely filing of a VSSR application prompted a commission investigation. On August 20, 2001, the commission's investigator issued a report.
 {¶ 8} 3. Following a hearing on March 11, 2002 which was recorded and transcribed for the record, a staff hearing officer ("SHO") issued an order finding that relator had violated Ohio Adm. Code 4121:1-5-07(M) relating to portable safety containers. The SHO explained his decision as follows:
 {¶ 9} "* * * [T]he injured worker was employed on the date of injury noted above, by the employer as a roll set-up molder; that the injured worker sustained an injury in the course of and arising out of employment when a combustible mixture he was using exploded, burning him and knocking him off a ladder and spilling the flammable mixture onto him.
 {¶ 10} "It is further the finding of the Staff Hearing Officer that the severity of the injured worker's injury was increased as a result of employer's failure to provide a portable safety container as required by OAC 4121:1-5-07(M), the Code of Specific Requirements of the Industrial Commission relating to Portable Safety Containers.
 {¶ 11} "Specifically[,] it is found that claimant was employed as a set-up molder; that among his duties was to coat the inside of a 13-inch diameter mold approximately 60 inches high with a slurry solution of Velvalite, a flammable mixture containing isopropyl alcohol, flour, and various solid substances; that the Velvalite had a flash point of 53.0 degrees Fahrenheit and a specific vapor density greater than air; that the material safety data sheets for Velvalite cautions that its heavier than air vapor may travel along the ground and be ignited by remote sources of ignition; that upon finishing the application of the slurry, claimant would ignite the coating solution and burn it off to clean the inside of the mold for re-use; that to reach the inside of the mold claimant would mount a ladder, dip a swab into a 3-5 gallon plastic bucket containing the slurry mixture set on top of the mold, and reach down into the mold cavity to coat the inside surface of the mold; that on the date of injury the mold was set upon 4-6 inch blocks raising the bottom above the floor and, in essence, converting a barrel (with a closed bottom) into a tube (with openings to the atmosphere at both top and bottom; that at the time claimant was wearing a simple T-shirt, flame-retardant pants, and workshoes; that the claimant had available for his use safety gloves, aluminized coat, aluminized `spats' to cover the portion of the feet exposed below the edge of the coat, and face mask; that while claimant was bent over the top of the mold with his arm inside the mold applying the slurry, the flammable heavier-than-air vapors escaping from the raised bottom of the mold reached an ignition source and exploded; that such explosion initially `flashed' flame over claimant and the bucket, while it's blast effect knocked him from the ladder into a railing, the blast at the same time knocking the open bucket of now-flamming [sic] slurry from the top of the mold, spilling its contents onto claimant.
 {¶ 12} "Claimant alleges violation of OAC 4121:1-5-07(M) Portable safety containers, which requires that[:]
 {¶ 13} "`Portable safety containers shall be provided for handling flammable liquids with a flash point (closed cup) below 138.2 degrees Fahrenheit in quantities of one gallon or more. The containers shall be legibly marked "flammable."
 {¶ 14} "Since the material data sheet for Velvalite indicates its flash point to be 53.0, OAC 4121:1-5-07(M) is found to be applicable.
 {¶ 15} "However, the term `portable safety container' is not defined in either Rule 4121:1-5-07, nor in Rule 4121:1-5-01(B) Definitions. Employer argues that, being undefined, it is not on notice as to what sort of container would meet the Specific Safety Requirement, and therefore cannot be held to have been in violation. Such argument is found to be unpersuasive. OAC 4121:1-5 consists of (other than definition) 309 pages of Specific Safety Requirements and only 153 specific definitions. Consequently, for the vast majority of the Specific Safety Requirements, recourse must be had to either general usage, or for the common usage in industry, for those terms not specifically defined in the OAC. To that end, recourse to the Dictionary of Terms used in the Safety Profession, 3rd edition, 1988, published by the American Society of Safety Engineers, leads to the following definition:
 {¶ 16} "SAFETY CAN — An approved closed container, of not more than 5 gallons capacity, that has a flash-arresting screen and a spring-closing lid and spout cover, and is so designed that it will safely relieve internal pressure when exposed to fire. (Emphasis added[.])
 {¶ 17} "While recourse to the OSHA; Standard29 C.F.R. § 1910.106(a) leads to a definition of such can as a[:]
 {¶ 18} " `Container of not more than 5 gallons capacity, having a spring closing lid and spout cover and so designed that it will safely relieve internal pressure when subjected to fire exposure.' (Emphasis added[.])
 {¶ 19} "Thus[,] it is held that — as used in the industrial sense — a portable safety container for handling flammable substances cannot be greater than 5 gallons capacity, must have a spring — closing lid (and if used for pouring, a spring-loaded spout cover), and be designed to safely relieve internal pressure when subjected to fire exposure. Of these elements the one most pertinent to the accident herein is the presence of a spring-closing lid that would have closed the container after claimant had dipped his swab in its contents preparatory to applying the swab to the inside of the mold. Since the bucket claimant was furnished was an open unlidded 3-5 gallon plastic bucket, OAC 4121:1-5-07(M) is found to have been violated.
 {¶ 20} "Had the container claimant had been using had such a lid, the contents would not have been ignited by the flash, nor would the flammable/flaming contents of the bucket have splashed upon claimant when the explosion knocked him off the ladder (and the bucket from the top of the mold). While such a lid would not have prevented the explosion, nor had any effect upon the injuries caused by the blast itself, nevertheless it would have avoided those burn injuries resulting from the flammable/flaming material being splashed onto claimant. Accordingly, the violation of OAC 4121:1-5-07(M) is held to have increased the severity of claimant's injuries.
 {¶ 21} "Employer's argument, that there is no evidence as to the effect that amount of `wash' left in the bucket at the time of the accident was one gallon or more, is found to be unpersuasive. The Staff Hearing Officer holds that it is the capacity of the container that is the essence of applicability, not the amount that would have remained in it as its contents was used up." (Emphasis sic.)
 {¶ 22} 4. Relator moved for rehearing pursuant to Ohio Adm. Code4121:1-3-20(G). In support of its motion, relator submitted the affidavit of Robert Samargia, safety director for relator's Youngstown, Ohio plant, and the affidavit of Dennis J. Dostal, safety director for relator's Canton, Ohio plant. Relator also submitted a letter, dated June 7, 2002, from Don E. McCoy, an industrial safety consultant employed by the Ohio Bureau of Workers' Compensation ("bureau").
 {¶ 23} 5. Mr. Samargia's affidavit, executed June 12, 2002, lists eight companies that are said to manufacture safety containers. Mr. Samargia avers that he was informed by a representative of each of the listed companies that "the company does not manufacture or sell any safety can with a spring closing lid which would have been suitable for the work in which the claimant was engaged on June 24, 1999."
 {¶ 24} 6. In his affidavit, Mr. Dostal avers that he contacted the bureau's division of safety and hygiene "to determine whether their representatives could identify any safety container with a spring closing lid which would have been suitable for the task in which the claimant was engaged on June 24, 1999." Mr. Dostal avers that, as a result of his inquiry, he received a letter from Don E. McCoy dated June 7, 2002.
 {¶ 25} 7. The June 7, 2002 letter from Mr. McCoy to Mr. Dostal states:
 {¶ 26} "* * * On June 3rd you called requesting assistance with the use and handling of flammable liquids that are applied to your molds. It is my understanding based on our phone conversation that you are applying approximately 3 gallons of a flammable liquid onto your molds using a 3 to 4 inch wide brush in a well-ventilated area. The container currently being used to holds [sic] the inflammable liquid is a can that holds approximately 3 to 5 gallons of liquid and has an opening that allows a 3 to 4 inch wide brush to be used to apply the material to the mold.
 {¶ 27} "Your question is? Do I know if there is any safety container that meets the requirements within the Ohio Administrative Codes that has a 3 to 4 inch opening that would allow the use of a paintbrush?
 {¶ 28} "* * *
 {¶ 29} "My answer after checking with Eagle and Justrite Manufactures of safety containers is, No. These manufactures do not make a product that will meet your existing application method. We also discussed alternative application methods such as a spray application and determined that would create additional hazards.
 {¶ 30} "* * *
 {¶ 31} "My Recommendation: Is that your keep the container you are currently using and the brush in a steel waste can that automatically closes (Refer: to Justrite Oily Waste Cans). For your application you may need to modify the foot lever by adding an extension onto the foot lever that will allow a hand to be user [sic] to open the lid."
 {¶ 32} 8. Claimant filed a memorandum in opposition to the motion for rehearing. Claimant contended in his memorandum that there were other companies that manufactured and sold safety containers meeting the requirements of the safety rule.
 {¶ 33} 9. On July 2, 2002, another SHO mailed an order denying relator's motion for rehearing. The SHO's order states in part:
 {¶ 34} "* * * [T]his hearing officer is not aware of any statute, rule, or case law that allows an employer to violate or ignore a specific safety requirement because equipment required by the code is not commercially available. Nor has the employer submitted any such law to support this argument. Therefore, the employer has not demonstrated a clear mistake of fact or obvious mistake of law on this point. Because the employer has sited [sic] no legal authority to support the position that the safety equipment required must be commercially available before the safety requirement can apply, the evidence to support the fact that no such safety equipment was commercially available is immaterial. Therefore, the new evidence submitted does not warrant a rehearing."
 {¶ 35} 10. On August 21, 2002, relator, United Foundries, Inc., filed this mandamus action.
Conclusions of Law:
 {¶ 36} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 37} In its brief, relator has captioned the following three arguments in support of its request for a writ of mandamus:
 {¶ 38} "I. The Industrial Commission Abused Its Discretion in Finding that United Foundries was Clearly Apprised of the Obligation to Provide Crnarich with a Safety Container Equipped with a Spring-Closing Lid and a Flash Arresting Screen.
 {¶ 39} "* * *
 {¶ 40} "II. The Industrial Commission Abused Its Discretion in Finding that if a Safety Container Equipped with a Spring-closing Lid and a Flash Arresting Screen Had Been Provided to Crnarich, His Injuries Would Have Been Less Severe.
 {¶ 41} "* * *
 {¶ 42} "III. The Industrial Commission Abused Its Discretion in Finding That O.A.C. 4121:1-5-07(M) Was Applicable to the Facts of This Claim." (Relator's brief at 7, 9, 10.)
 {¶ 43} At oral argument before the magistrate, relator's counsel elected to address only the third argument presented in relator's brief without, however, waiving the other two arguments. Because relator elected to focus on its third argument at the oral argument, the magistrate will first address relator's third argument and will then address relator's first and second arguments presented in its brief.
 {¶ 44} Ohio Adm. Code Chapter 4121:1-5 sets forth the commission's specific safety requirements for workshops and factories.
 {¶ 45} Ohio Adm. Code 4121:1-5-07 is captioned "Hand tools, hand-held portable powered tools, other hand-held equipment and portable safety containers."
 {¶ 46} Ohio Adm. Code 4121:1-5-07(M) states:
 {¶ 47} "Portable safety containers shall be provided for handling flammable liquids with a flash point (closed cup) below 138.2 degrees Fahrenheit in quantities of one gallon or more. The containers shall be legibly marked `flammable'."
 {¶ 48} The first issue to be addressed (relator's third argument in its brief) is whether the commission abused its discretion in determining that Ohio Adm. Code 4121:1-5-07(M) was applicable to the facts of the VSSR claim. This issue challenges the commission's interpretation of its safety rule as well as the evidence supporting applicability.
 {¶ 49} Portions of claimant's transcribed testimony at the March 11, 2002 hearing are pertinent here. During direct examination of claimant, the following exchange occurred:
 {¶ 50} "Q. [Claimant's counsel] So when you are carrying this material from the mixer to where you are doing the wash job, what are you using to do that?
 {¶ 51} "A. [Claimant] I don't quite understand the question.
 {¶ 52} "Q. [Claimant's counsel] What are you using to carry it?
 {¶ 53} "A. [Claimant] Oh, the plastic buckets that we get from the furnace. When they patch the furnace, you get a plastic bucket, empty it out, clean it real good and pour the stuff in it and put your horse hair mop in it. Like a mop, yes. And then you go and you put it on the mold and you just do your thing. And then once you wash it, then you take everything away, you know, and you get a match and you throw it and it goes up.
 {¶ 54} "Q. [Claimant's counsel] Okay. Let's do that a little stage by stage, okay?
 {¶ 55} "The bucket, how many gallons is the bucket usually?
 {¶ 56} "A. [Claimant] Usually three gallon, because the five gallon are too heavy.
 {¶ 57} "Q. [Claimant's counsel] You use a five gallon, too?
 {¶ 58} "A. [Claimant] Oh, yeah. We try to get the three gallon one.
 {¶ 59} "Q. [Claimant's counsel] Okay. Never less than three gallon?
 {¶ 60} "A. [Claimant] No, no." (Stipulation at 357.)
 {¶ 61} During cross examination of claimant, the following exchange occurred:
 {¶ 62} "Q. [Relator's counsel] And how many extensions did Mr. Globeck coat, do you have any idea?
 {¶ 63} "A. [Claimant] No, I have no idea. There was quite a few there.
 {¶ 64} "Q. [Relator's counsel] Quite a few?
 {¶ 65} "A. [Claimant] I could not say how many.
 {¶ 66} "Q. [Relator's counsel] So Mr. Globeck finished coating them and then he gave the bucket to you to go ahead and coat the cope that you were working on?
 {¶ 67} "A. [Claimant] Well, I guess he — I was down below, and I just had come up, okay, he was done with whatever he was doing with that, he lit them off and all that other stuff and I come up and he says here, here is a bucket, and I say okay — we were friends, you know, and instead of him taking that bucket and putting it back, he gave it to me.
 {¶ 68} "Q. [Relator's counsel] So you didn't actually go that morning with a bucket to the barrel and draw the alcohol wash yourself?
 {¶ 69} "A. [Claimant] No, no." (Stipulation at 384-385.)
 {¶ 70} Also pertinent here is the closing argument of relator's counsel at the hearing. Relator argued:
 {¶ 71} "* * * [T]he safety container is required only in instances where the container holds a quantity of a gallon or more. Now, in this instance, you heard the claimant testify that on the morning that he did this process he did not go fill the bucket up himself, it was a three gallon bucket. Instead, he got a bucket that had contained alcohol wash that had been used by another co-employee and part of it was already gone before he received it and then he proceeded to use it. There is no way in which you can identify at this point in time that what remained in that bucket was a gallon or more, and absent that evidence there is no basis to prove the applicability of this section." (Stipulation at 445.)
 {¶ 72} By its argument, relator suggests that the applicability of the safety rule depends upon a commission determination supported by some evidence that there was a gallon or more of Velvalite in the bucket when claimant received it from Mr. Globeck. Relator contends that there is no evidence in the record upon which the commission could make the determination that claimant's bucket contained a gallon or more of Velvalite prior to the industrial accident.
 {¶ 73} Moreover, relator contends that the SHO's order of March 11, 2002 indicates that the commission misinterpreted its safety rule by stating:
 {¶ 74} "Employer's argument, that there is no evidence as to the effect that amount of `wash' left in the bucket at the time of the accident was one gallon or more, is found to be unpersuasive. The Staff Hearing Officer holds that it is the capacity of the container that is the essence of applicability, not the amount that would have remained in it as its contents was used up." (Emphasis sic.)
 {¶ 75} It is well-settled that a VSSR award is deemed a penalty to the employer subject to the rule of strict construction with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer. State ex rel. Watson v. Indus. Comm. (1986), 29 Ohio App.3d 354; State ex rel. Burton v. Indus. Comm. (1989), 46 Ohio St.3d 170.
 {¶ 76} It is also firmly established that the determination of disputed factual situations as well as the interpretation of a specific safety requirement is within the final jurisdiction of the commission, and subject to correction in mandamus only upon a showing of an abuse of discretion. State ex rel. Roberts v. Indus. Comm. (1984), 10 Ohio St.3d 1; State ex rel. Allied Wheel Products, Inc. v. Indus. Comm. (1956),166 Ohio St. 47; State ex rel. Volker v. Indus. Comm. (1996),75 Ohio St.3d 466.
 {¶ 77} Of course, the commission's authority to interpret its own safety rules is not unlimited. Strict construction does require that the commission's interpretation be reasonable. State ex rel. Martin Painting Coating Co. v. Indus. Comm. (1997), 78 Ohio St.3d 333, 342. The commission may not effectively rewrite its own safety rules when it interprets them. State ex rel. Lamp v. J.A. Croson Co. (1996),75 Ohio St.3d 77, 81.
 {¶ 78} The magistrate disagrees that the commission abused its discretion in determining that Ohio Adm. Code 4121:1-5-07(M) was applicable to the VSSR claim. The magistrate disagrees with relator's assertion that the commission misinterpreted its safety rule. The magistrate disagrees with relator's assertion that there is no evidence supporting the applicability of the safety rule to the circumstances of the industrial accident.
 {¶ 79} Under relator's interpretation of the safety rule, its duty to provide a safety container arose only when the Velvalite was poured into a container at or above the one gallon mark; correspondently, its duty would be extinguished when the Velvalite volume fell below the gallon mark during the process of applying the mixture. Thus, under relator's interpretation of the safety rule, its duty to its employee would rise and fall with the changing volume of the Velvalite as it was consumed during the work process.
 {¶ 80} In the magistrate's view, the commission was not required to adopt, even under strict construction principles, such an unworkable view of the employer's duty to its employees under the rule. The commission could view the employer's duty to provide a safety container as arising when the employer knew or should have known that its employee would be handling a gallon or more of a flammable liquid. The duty to provide a safety container would logically remain with the employer regardless of the rise and fall of the volume of a flammable liquid being handled at any given time.
 {¶ 81} In his order, the SHO attempted to explain his reason for rejecting the employer's view of the safety rule. The capacity of the non-safety containers provided by the employer for use in handling the flammable liquid was indeed highly relevant to a determination that the employer had a duty under the rule to provide a safety container.
 {¶ 82} It can easily and reasonably be inferred from the undisputed evidence that the employer provided three and five gallon buckets for handling the flammable liquid, that the volume of the liquid being carried in the buckets was at times one gallon or more. It would make no sense for an employer to provide five gallon buckets as an alternative to the three gallon buckets if the worker was never required to handle a gallon of flammable liquid at a time. That the employer provided five gallon non-safety buckets as an alternative to the three gallon non-safety buckets creates a strong inference that its employees typically handled a gallon or more of flammable liquid at any given time.
 {¶ 83} The magistrate now turns to relator's first argument presented in relator's brief. The magistrate elects to set forth verbatim the entirety of relator's first argument:
 {¶ 84} "As stated in the Commission order, the term `portable safety container' as used in O.A.C. 4121:1-5-07(M) is not defined in the Ohio Administrative Code. Under such circumstances, the SHO correctly pointed out that the Commission has the discretion to rely upon `general usage, or for the common usage in industry, for those terms not specifically defined in the O.A.C.' (Record at 495.) Thus, in this instance, the Commission adopted the American Society of Safety Engineers and OSHA definition of a `safety can' as one equipped with a spring-closing lid and a flash arresting screen.
 {¶ 85} "While the Staff Hearing Officer did have discretion to look elsewhere for definitions of terms not specifically defined in the Ohio Administrative Code, that discretion is not without limits. In this instance, the Commission adopted a definition of `portable safety container' without receiving any evidence at the VSSR hearing that containers so equipped were commonly used in the foundry industry for the work of the type the claimant was performing on the date of his accident.
 {¶ 86} "Following receipt of the Commission order finding a violation of O.A.C. 4121:1-5-07(M), and facing a possible new citation if the violation was not corrected within 90 days (Record at 498), Respondent United Foundries attempted to locate a portable safety container equipped with a spring-closing lid and flash arresting screen which would be usable for the work being performed by the claimant on the date of his injury. The affidavits of Robert Samargia, Safety Director for the United Foundries Youngstown, Ohio plant (Record at 504-505) and Dennis J. Dostal, Safety Director for the United Foundries Canton, Ohio plant (Record at 506-507) verify that they canvassed the usual manufacturers/suppliers of safety equipment and were unable to locate any safety can with a spring-closing lid which would have been suitable for the work in which Mr. Crnarich was engaged in June 1999. Having failed to locate a source of supply for a container which would meet the definition adopted by the Commission Staff Hearing Officer, Respondent United Foundries requested the assistance of the Bureau Division of Safety and Hygiene, the state agency charged with promulgating and policing workplace safety requirements. In response to that request, Don E. McCoy, BWC Industrial Safety Consultant Specialist, in his letter of June 7, 2002 to Mr. Dostal (Record at 516-519), reported that he too was unable to locate a source of supply for a portable safety container which would meet the definition adopted by the Commission and be suitable for the work which Mr. Crnarich was performing on the date of his accident.
 {¶ 87} "In the absence of any evidence that containers equipped with spring-closing lids and flash arresting screens were commonly used in the foundry industry and in view of the fact that neither the Relator nor the Division of Safety and Hygiene itself could locate a safety container so equipped which was suitable for the work being performed by Richard Crnarich, the Commission abused its discretion in finding that O.A.C. 4121:1-5-07(M) clearly apprised United Foundries that it had a legal obligation to provide such a safety container for use by its employees. Thus, a writ of mandamus should be issued ordering the Commission to deny the VSSR claim of Respondent Crnarich." (Relator's brief at 7-9.)
 {¶ 88} Significantly, relator's first argument relies upon the evidence it presented in support of its motion for rehearing, yet relator does not argue that the commission abused its discretion by denying its motion for rehearing. This magistrate will not address relator's first argument as if it were presented by relator as a challenge to the commission's denial of its motion for rehearing. The magistrate shall assume that, since relator does not argue for an abuse of discretion in the denial of the motion for rehearing, that it does not believe that the commission abused its discretion in that regard.
 {¶ 89} Given that relator does not challenge the commission's denial of its motion for rehearing, we are faced with relator's reliance upon evidence that was not before the SHO at the March 11, 2002 hearing. Obviously, the commission cannot have abused its discretion with respect to evidence that was not presented to it at the time it heard the matter. On that basis alone, relator's first argument lacks merit.
 {¶ 90} The magistrate now turns to relator's second argument presented in relator's brief. The magistrate elects to set forth verbatim the entirety of relator's second argument:
 {¶ 91} "In addition to assuming (incorrectly) that portable safety containers equipped with flash arresters and spring-closing lids were commonly used in the foundry industry for activities such as the claimant was engaged in on June 24, 1999, the Commission engaged in sheer speculation when it found that the presence of a spring-closing lid would have prevented the Velvalite from spilling onto Mr. Crnarich when he was knocked off the ladder. There was no evidence adduced at the hearing from which the Commission could have found that, if available, a safety container with a spring-closing lid would not have spilled the contents when overturned during the violent explosion of the cope. Therefore, the conclusion of the Commission that the absence of a container with a spring-closing lid proximately increased the injuries sustained by Respondent Crnarich is unsupported by any evidence. Having failed to establish a proximate relationship between any violation of O.A.C.4121:1-5-07(M) and the severity of injuries received by Crnarich, the Industrial Commission order finding a VSSR violation should be overturned." (Relator's brief at 9-10; emphasis sic.)
 {¶ 92} In essence, relator's second argument is that there is no evidence to support a proximate causal connection between relator's failure to provide a safety container and any of claimant's injuries of record.
 {¶ 93} In response to relator's argument, the commission here cites to the reports of two safety experts, Earl D. Gregory, Ph.D., CSP, CIH, and Gerry S. Mang, C.F.E.I.
 {¶ 94} The Gregory report, dated February 18, 2002, states in part:
 {¶ 95} "The cope washing or alcohol washing solution was unsafely transported, carried, and handled or applied by means of open plastic buckets. This increased the potential of fire since it allowed more vapors to evaporate from the open container, as well as exposing the liquid and high vapor concentration close to the liquid surface to any potential ignition sources in the area. Covered containers prevent those hazards. * * * In fact, had the liquid been in a covered container, it would not have spilled all over Mr. Crnarich during the accident and his clothing would not have ignited, thus greatly reducing his injuries." (Stipulation 306.)
 {¶ 96} The Mang report, dated February 28, 2002, states:
 {¶ 97} "The type of container used to transport and store the flammable liquid at the time of the incident does not meet the standards for the codes. The container should have been a safety can. The safety can would have prevented a flash back to the contents of the container, which would have most likely prevented the ignition of the remaining content. This would have lessened the amount of fuel for the fire to consume, thereby lessening the amount of burning, and would have prevented spillage on the floor and directly on Mr. Crnarick [sic]." (Stipulation 315.)
 {¶ 98} In its reply brief, relator responds to the commission's position as follows:
 {¶ 99} "* * * Neither expert considered the fact that the explosion did not originate in the container being used by Respondent Crnarich but, instead, from within the cope on which he was working. Neither offered any opinion as to how a portable safety container meeting the definition adopted by the Commission would have performed in the midst of such a catastrophic explosion. One is left only to speculate, as did the Industrial Commission Staff Hearing Officer, that a portable safety container equipped with a spring closing lid and a flash arrester would not have spilled its contents onto Respondent Crnarich when it was blown off the top of the cope during the explosion. Without some evidence as to how a portable safety container would have probably reacted in the face of an external explosion, such speculation cannot provide the basis for finding a VSSR violation in this claim." (Relator's reply brief at 2-3; emphasis sic.)
 {¶ 100} Relator's criticism of the Gregory and Mang reports simply ignores the fact that those experts opined that a safety container would have prevented ignition of the liquid in the container under the circumstances of this case. While Gregory and Mang provide opinions as to what would have happened had the employer provided a safety container, it is incorrect for relator to assert that the commission's decision is premised only upon "speculation." Expert opinion is not tantamount to speculation.
 {¶ 101} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.