THE STATE EX REL. MARTIN PAINTING & COATING COMPANY, APPELLANT
AND CROSS-APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO;
MARCUM ET AL., CROSS-APPELLANTS AND APPELLEES.

[Cite as *State ex rel. Martin Painting & Coating Co.
v. Indus. Comm.* (1997), 78 Ohio St.3d 333.]

(No. 94–2727—Submitted February 18, 1997—Decided May 7, 1997.)

334

336

338

*Buckingham, Doolittle & Burroughs, Brett L. Miller* and *Richard A. Hernandez,* for appellant and cross-appellee.

*James L. Mackin, Patrick J. Piccininni* and *Douglas A. Curran,* for cross-appellant and appellee Shangrila Marcum.

*Handelman & Kilroy* and *Robert K. Handelman,* for cross-appellant and appellee Stephanie Rinehart.

*Per Curiam.* Martin denies that it violated Ohio Adm.Code 4121:1–3–10(C)(1) and (2), or 4121:1–3–10(K)(5). The widow-claimants disagree, and assert further violations of Ohio Adm.Code 4121:1–3–10(K)(6) and (8). They alternately dispute the necessity of award recalculation. For the reasons to follow, we affirm the judgment of the court of appeals in its entirety.

Ohio Adm.Code 4121:1–3–10(C)(1) and (2) state:

"(1) The footing or anchorage for scaffolds shall be sound, rigid, and capable of carrying four times the maximum rated load without settling or displacement. * * *

"(2) Scaffolds and their components shall be capable of supporting without failure no less than four times the maximum rated load."

The commission found that the unavailability of sufficient counterweight violated these sections. Martin stresses the commission's responsibility to strictly construe specific safety requirements in the employer's favor (*State ex rel. Burton v. Indus. Comm.* [1989], 46 Ohio St.3d 170, 545 N.E.2d 1216), and argues that because neither provision mentions counterweight, the commission abused its discretion in finding VSSRs. This argument fails.

While neither section expressly discusses counterweight, both sections do require that the equipment support four times the maximum rated load. For the equipment to do so, the manufacturer's specifications demand that "[o]utriggers

from which the supporting rope is hung are to be securely tied back to the building as well as having the proper amount of counterweights." Thus, for this particular scaffold, implicit in the satisfaction of this requirement is adequate counterweight. The commission did not, therefore, abuse its discretion in so holding.

Martin alternately argues that adequate counterweights were available but were ignored by decedents. Citing *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.* (1988), 37 Ohio St.3d 162, 524 N.E.2d 482, Martin argues that this is an act of unilateral negligence by the decedents that negates a violation by Martin. This assertion also fails.

*Brown* applies only where an otherwise complying device is rendered noncompliant by deliberate claimant action. In this case, there is "some evidence" that there was not sufficient counterweight on site to have ever rendered the scaffold compliant. Engineer Dunham estimated the necessary amount of counterweight at a minimum of six hundred pounds. Again, only two hundred pounds of counterweight were found at the job site.

Martin's position is further undermined by *State ex rel. Cotterman v. St. Marys Foundry* (1989), 46 Ohio St.3d 42, 544 N.E.2d 887. There, two foundry employees were cleaning a suspended two-and-one-half-ton core. During this process, two chain hooks failed, causing the core to fall upon, and kill, one of the employees.

Investigation revealed that the suspension chains used for that job had a cumulative load capacity of only four thousand pounds. Attempting to avoid VSSR liability, the employer argued that the accident was caused not by the employer's malfeasance, but by the decedent-supervisor's failure to select available suspension chains capable of holding the core.

We rejected that argument, writing:

"An employer does not escape liability for violation of a specific safety requirement by giving a supervisory employee the responsibility to comply with such safety requirement. Although the record shows that the decedent was a safety-conscious employee who had received safety training, the ultimate responsibility for meeting specific safety requirements remains with the employer.
" * * *

"The ultimate responsibility of providing a safe work environment lies with the employer and it cannot be delegated to a subordinate. In this case, St. Marys Foundry must effectuate some means of accurately and precisely exhibiting the weight of the core and the appropriate chain sling to be used. St. Marys Foundry cannot simply turn this task over to a superintendent to select the right chain sling for each core. Providing a variety of chain slings is insufficient to

show compliance with Ohio Adm.Code 4121:1–5–15(D)(2). Hence, St. Marys Foundry has violated the specific safety requirement and appellant is entitled to an additional award for a VSSR." 46 Ohio St.3d at 48, 544 N.E.2d at 892–893.

The present case is even more compelling, for not only did Martin delegate counterweight selection to its employees, but it did so without instructing employees in the proper computation, as evidenced by an exchange between claimant Rinehart's counsel and Randy Bush, Martin's field supervisor:

"Q. [Claimant's counsel]: So I gather you rely on your employees to sort of use their collective experience and wisdom in trying to figure out how much counterweight was appropriate for a given job?

"A. [Bush]: We have discussions, and rely on experience, yes.

"Q. [Counsel]: You don't give them any actual shop training for sitting down with any calculators, the way we do, or an engineer did, or Mr. Fowler does, and try to figure out how much actual weight should be on the outriggers; correct?

"A. [Bush]: We don't do that, actually * * *."

As engineer Hal Dunham's testimony demonstrated, counterweight calculation is very complex. Randy Bush admitted that even after twenty-four years with the company, he could not perform the counterweight computation. Thus cognizant of the formula's complexity, Martin nevertheless left it to the two decedents—neither of whom apparently finished high school—to make an on-the-spot determination as to the necessary amount of counterweight. Unfortunately, in this instance, their estimate was wrong.

Martin additionally asserts that the commission treated Ohio Adm.Code 4121:1–3–10(C)(1) and (2) as identical, resulting in an impermissible double penalty for the same infraction. We are unpersuaded by this argument.

The same deficiency did generate two violations. Ohio Adm.Code 4121:1–3–10(C)(1) requires that "footing or anchorage for scaffolds" hold four times the maximum rated load. Section (C)(2) makes the same demand of "scaffolds and their components." No one seriously disputes that the accident was caused by the outriggers' inability to support four times the maximum rated load. Because an outrigger qualifies as both Section (C)(1) "anchorage" and a "scaffold component" under Section (C)(2), two violations were found.

Martin challenges the permissibility of this result, without offering much support for its position. Martin argues that the commission's interpretation of these provisions violates the directive to strictly interpret specific safety requirements in the employer's favor. This assertion is tenuous, for Martin seems to equate strict construction with a finding of the provisions' inapplicability. It ignores that strict construction does not always demand a finding that no

violation occurred. In this case, there is little question that outriggers constitute both anchorage and a scaffold component.

While there are no cases that address Martin's argument as specifically phrased, our review nevertheless disfavors the employer's position. *State ex rel. Smith v. Huguelet* (1991), 57 Ohio St.3d 1, 564 N.E.2d 698, has already upheld the commission's right to find that a single accident encompassed multiple VSSRs. This, in turn, sets the stage for some overlap in terms of violations found, as *State ex rel. Winzeler Excavating Co. v. Indus. Comm.* (1992), 63 Ohio St.3d 290, 586 N.E.2d 1087, demonstrates.

A Winzeler employee died when a sewer trench collapsed. Investigation determined that the cave-in resulted from the employer's failure to brace or shore the trench. Two VSSRs were alleged. The first, Ohio Adm.Code 4121:1–3–13(E)(1) provided:

"The wall and faces of all excavations in which employees are exposed to danger from moving ground shall be guarded by a shoring system, sloping of the ground, or some other equivalent means. * * * "

Ohio Adm.Code 4121:1–3–13(E)(7) also demanded:

"If it is necessary to place or operate power shovels, derricks, trucks, materials or other heavy objects on a level above and near an excavation, the site of the excavation shall be sheet-piled, shored, braced or sloped as necessary to resist the extra pressure due to such superimposed loads."

The commission found violations of both sections, and we agreed, despite the fact that the same deficiency—inadequate shoring—underlay both violations. The commission's assessment in this case is not without precedent, and, as such, we find that the commission did not abuse its discretion in finding violations of Ohio Adm.Code 4121:1–3–10(C)(1) and (2).

Martin also contests the commission's determination that the requirement of Ohio Adm.Code 4121:1–3–10(K)(5) was not met. That section reads:

"The roof irons or hooks shall be of mild steel, or other equivalent material, of proper size and design, securely installed and anchored. Tiebacks of three-quarter-inch manila rope, or the equivalent, shall serve as an additional means of anchorage, installed at right angles to the face of the building, whenever possible, and secured to a structurally sound portion of the building."

At issue is the section's second sentence. According to engineer Hal Dunham, a tieback is "a rope or cable that connects to the outrigger. There is an I-bolt, and this outrigger had an eyebolt for attachments, and the cable runs in the opposite direction from where the platform is, and secures to an object on the building or structure you are working on."

The manufacturer's specifications for the scaffold in question called for a minimum five-sixteenths-inch wire rope with a breaking strength of 8,060 pounds.

It is undisputed that the outriggers were not tied back. Martin concedes that the accident would not have occurred if tiebacks had been used. It instead argues that Ohio Adm.Code 4121:1–3–10(K)(5) does not apply. Alternatively, it claims that even if applicable, tiebacks were available, but were not used by the decedents. Neither argument has merit.

Citing Section (K)(5)'s lead sentence, Martin asserts that under the doctrine of strict construction, tiebacks are only necessary when a scaffold is secured by roof hooks or irons. Since this scaffold employed an outrigger system rather than hooks, Martin maintains that the provision does not apply. We disagree.

There is nothing to indicate that the second sentence is dependent upon the first. Martin's proposed interpretation suggests a result that seems both inconceivable and unacceptable—that the Administrative Code's authors intended to extend the secondary safety coverage of Section (K)(5) to some, but not all, scaffold employees.

It is within this context that we find the strongest rationale for affirming the commission. Strict construction requires that "all *reasonable* doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer." (Emphasis added.) *Burton*, 46 Ohio St.3d at 172, 545 N.E.2d at 1219. We find that it would be *unreasonable* to assume that the regulators intended to free employers from providing tiebacks for scaffolds supported by outriggers as opposed to hooks. Such reasoning is even more compelling when one considers that on four separate occasions the manufacturer's specifications mandate that outriggers be tied back. The commission's interpretation of Ohio Adm.Code 4121:1–3–10(K)(5) as encompassing all scaffolds was not, therefore, an abuse of discretion.

Assuming *arguendo* the applicability of Ohio Adm.Code 4121:1–3–10(K)(5), Martin again asserts that the required equipment was available but was ignored by the decedents. Again, this contention is unpersuasive.

An inspection performed the day after the accident found no tiebacks at the accident scene. Hal Dunham reached the same conclusion after reviewing OSHA documentation and photographs. Martin responds that there was loose rope on the tank roof that decedents could have used to fashion their own tiebacks. The manufacturer's specifications, however, contradict the assertion that just any rope could be used as a tieback. To the contrary, they specify a wire rope of at least five-sixteenths inch with a breaking strength of 8,060 pounds. There is no evidence that the loose rope met these specifications. The commission, therefore, properly rejected this argument.

Concerning the cross-appeals before us, widow-claimants contest the appellate court's decision to vacate the violations under Ohio Adm.Code 4121:1–3–10(K)(6) and (8). We again affirm the judgment of the court below.

Ohio Adm.Code 4121:1–3–10(K)(6) reads:

"Two-point suspension scaffolds shall be suspended by wire, synthetic, or fiber ropes capable of supporting no less than six times the maximum rated load. All other components shall be capable of supporting no less than four times the maximum rated load."

The court of appeals summed up the violation of Section (K)(6) best:

"There is no evidence in the record that the cables on which the scaffold was suspended contributed to the accident. *The cables from which the scaffold was suspended were simply never an issue in this case.*" (Emphasis added.)

Unsecured outriggers, not defective cables, caused the accident. As such, the court below correctly vacated this VSSR.

The remaining regulation, Ohio Adm.Code 4121:1–3–10(K)(8), states:

" * * * Each employee shall be protected by an approved safety belt attached to a lifeline. The lifeline shall be securely attached to substantial members of the structure (not scaffold) or to securely rigged lines, which will safely suspend the employee in case of a fall."

The commission found a Section (K)(8) violation, but offered no evidence or explanation in support. Unlike Section (K)(6), however, there is a legitimate issue as to whether Section (K)(8) was satisfied, making a return to the commission for further consideration appropriate.

There is evidence indicating that lifelines were attached to a secured portion of the tank. For reasons unknown, however, decedents had not attached the lines to their safety belts. If decedents deliberately disregarded the lifelines, VSSR liability may be inappropriate. See *Kale v. Indus. Comm.* (May 3, 1984), Franklin App. No. 83AP–968, unreported, 1984 WL 5731. If, however, there were other reasons for the failure to wear those lines, an additional award may be proper. The issue, therefore, warrants a return to the commission for further exploration.

Turning to the final proposition raised, award recalculation, we note that among the factors considered in determining the amount of a VSSR award are the seriousness and number of violations. In this case, the commission's award was premised on five violations. Litigation has since reduced that number to three, possibly two, violations. This reduction merits award recalculation.

The widow-claimants argue that regardless of the number of violations ultimately found, the fact that two people died justifies the present high award. This assertion is unpersuasive. This was unquestionably a very tragic incident.

However, neither of the surviving widows may capitalize on the death of the other's decedent in order to enhance her individual award. Each award to a widow-claimant must be based on the violations committed against her decedent only.

The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.