DECISION
{¶ 1} Relator, Cleveland Rebabbitting Service, Inc., has filed an original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its award to respondent, Roderick E. Jenkins, for relator's violations of three specific safety requirements.
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court issue a writ of mandamus ordering the commission to vacate that portion of its order finding that relator violated Ohio Adm. Code 4121:1-5-16(E)(2)(d) and that portion of its order assessing a penalty of 40 percent, and to enter an amended order that assess an appropriate percentage penalty based upon relator's violations of Ohio Adm. Code 4123:1-5-16(C)(1) and4123:1-5-16(E)(3)(a)(ii). (Attached as Appendix A.) No objections have been filed to that decision.
 {¶ 3} Finding no error or other defect on the face of the magistrate's decision, and based upon an independent review of the evidence, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law. In accordance with the magistrate's decision, relator's requested writ is granted to the extent that the commission's order is vacated as to that portion finding relator in violation of Ohio Adm. Code 4121:1-5-16(E)(2)(d) and that portion assessing a penalty of 40 percent, and this matter is remanded to the commission for a re-determination of the percentage penalty based upon relator's violations of Ohio Adm. Code 4123:1-5-16(C)(1) and4123:1-5-16(E)(3)(a)(ii).
Writ of mandamus granted.
Klatt, P.J., and Travis, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
The State of Ohio on Relation of : Cleveland Rebabbitting Service Inc., : :
Relator, : :
v. : No. 05AP-342 :
The Industrial Commission of Ohio, : (REGULAR CALENDAR) The Bureau of Workers' Compensation : and Roderick E. Jenkins, : :
Respondents. :
 NUNCPROTUNC MAGISTRATE'S DECISION Rendered on January 13, 2006 Brouse McDowell, and Cathryn R. Ensign, for relator.
Jim Petro, Attorney General, and Dennis H. Behm, for respondents Industrial Commission of Ohio and Bureau of Workers' Compensation.
Duane E. Cox, for respondent Roderick E. Jenkins.
 IN MANDAMUS {¶ 4} In this original action, relator, Cleveland Rebabbitting Service, Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its award to respondent Roderick E. Jenkins for relator's violations of specific safety requirements ("VSSR").
Findings of Fact:
 {¶ 5} 1. On May 19, 2000, Roderick E. Jenkins ("claimant") sustained severe multiple injuries while employed as a foundry laborer for relator. The claim is allowed for:
Amputation right 4th finger; circulatory disease right, early complication trauma right. Open wound leg bilateral, amputa-tion mid right 2nd, 3rd, and 4th fingers. Amputation above right knee unilateral; cervical, thoracic and lumbar sprains.
 {¶ 6} 2. On November 28, 2001, claimant filed a VSSR application alleging multiple violations of specific safety requirements. Among the list of safety rules allegedly violated were three "cutting and welding" requirements set forth at Ohio Adm. Code 4123:1-5-16 at issue in this action.
 {¶ 7} 3. The VSSR application prompted an investigation by the Ohio Bureau of Workers' Compensation Safety Violations Investigations Unit ("SVIU"). The SVIU investigator issued a report dated September 17, 2002.
 {¶ 8} 4. The SVIU report indicates that the investigator visited the accident site on September 9, 2002, with less than satisfactory results: "The involved Harris torch was not available during the on-site visit. [Relator's attorney] advised that the involved torch was in the possession of the claimant's civil lawsuit attorney."
 {¶ 9} 5. The SVIU report further indicates that the investigator interviewed claimant at his residence on April 9, 2002, and obtained an affidavit:
Cleveland Rebabbitting Service hired me in October 1998 as a Foundry Laborer. My duties as a Foundry Laborer included using various torches to melt down, and then recast babbit (soft metal) linings of various sized electric motor bearings. The various torches included both propylene and acetylene torches. The torch involved in my accident was a propylene torch.
I had no prior experience in performing this type of work prior to this job. Cleveland Rebabbitting Service did not provide me with any formal type of training at all. The only thing that resembled any form of training was to have another employee come show me how to turn on the torches and how to adjust the flames. No other training or instruction was provided.
More specifically, my duties involved taking these electric motor bearings and preparing reports on the specifications of the babbit lining. I would then take these bearings from a bin and taking them over to a steel table where I would remove the bolts and separate the two halves. I would stand one half up and prepare it to melt down the existing babbit. I would then get the propylene and oxygen torch, turn on the propy-lene, light the torch, turn on the oxygen, make adjustments, and then I would begin to apply heat from the torch to the bearing in either a side to side or and [sic] up and down motion until the existing babbit was melted down and removed. After the babbit was removed I would turn the torch off and take the bearing to another table. At the next table I would clean out the are[a] where the babbit was melted away, prepare the surface, then recast the bearing with new molten babbit, let cool, and go on [to] the next bearing.
* * *
There was no maintenance program or any type of routine inspection or maintenance performed on the torches, tanks, hoses, valves, etc. I have never seen Cleveland Rebabbitting Service contract or employ any third party company or contractor to ever come in and inspect or service any of this equipment. No maintenance or inspection forms or records were ever prepared for this equipment. There was no pro-cedure in place to report problems with equipment, other than to verbally advise the Shop Foreman, David Martin.
Because I was not properly trained on the use or main-tenance of this equipment, I could only guess when I suspected that there was a problem. If it was something that needed adjusted I was required to do that myself. If it were broke I would tell David Martin. At that point David Martin would decide if he felt if the equipment needed repaired or not. If he felt it was in need of repair he would do it himself.
During the approximately two years that Cleveland Rebabbitting Service employed me, prior to my accident, I had experienced numerous problems with the involved equipment. Again, due to my lack of proper training, I was not sure exactly what would have been considered a problem and what was considered normal. When I reported problems to David Martin I was repeatedly told that it was normal or it was OK and that there was nothing he could do about [it]. One recurring problem over this two-year period was a loud popping noise coming from the torch. It sounded sort of like a machine gun going off. This problem worsened over the two years that I had been there. I would report this problem approximately three or four times every week, but nothing was ever done to correct the problems. David Martin would say to me, "there's nothing I can do about it". And then I would be told to go back to work.
Additional problems that frequently occurred were worn hoses, which I would replace myself, and loose adjustment knobs on the two hoses at the end of the torch. I would also tighten those myself. There were always a few new hoses on hand, but David Martin ALWAYS discouraged us from using any of the new parts unless we ABSOLUTELY had to.
On the date of my accident I arrived at work at approximately 5:15 AM and began work at approximately 5:30 AM. I * * * began to perform my daily tasks exactly as I have always done * * *. I was working on the second half of the first bearing that morning. This bearing was approximately sixteen inches (16") to eighteen inches (18") in height. I was holding the lit torch in my right hand and approximately fifteen seconds into the task the torch in my hand exploded knocking me backwards and to the floor. Within approximately another ten to fifteen seconds, the hose re-ignited causing a backflash. This backflash burned me again causing additional injuries to my body.
(Emphasis sic.)
 {¶ 10} 6. According to a supplemental report, on May 22, 2003, the SVIU investigator met with claimant's attorney "in order to inspect and photograph the actual HARRIS, model 43-2, gas welding torch." (Emphasis sic.) The May 22, 2003 supplemental report states:
The torch was measured at twenty-eight and one-half inches (28½") in length. It has two (2) control valve knobs in which to control the flow of propylene and oxygen. The involved hoses were not available. * * *
Upon visual inspection of the involved torch, Investigator Medina noticed visible damage at the base of the handle, and on the bottom flow control valve. The base of the handle was bent and might be a source of a possible leak in its present condition. * * *
The left-side valve appeared to be working properly, how-ever[,] the bottom valve was inoperable. The knob was bent or out of alignment and could not be easily opened or closed. This damage can be seen in most of the supplemental photographs depicting the handle of the torch.
[Claimant's attorney] advised that the employer contends that the noted damage to the valve and handle was a result of debris hitting the torch at the time of the incident. It could not be ascertained by visual inspection if that was true or false, however[,] Investigator Medina viewed and photographed virtually every angle of the handle and valves. There were no obvious visual signs of impact on these areas that might have caused such damage. * * *
 {¶ 11} 7. The supplemental report contains several photographs of the torch at issue. The SVIU investigator repeatedly refers to the torch depicted in the photographs as the "Harris gas welding torch."
 {¶ 12} 8. On August 12, 2003, the VSSR application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record. At the hearing, Richard Hayes testified on behalf of relator. Mr. Hayes is a former employee of the Occupational Safety and Health Administration ("OSHA") where he supervised a staff of OSHA compliance officers prior to becoming a private consultant on health and safety issues. (Tr. 208.) Mr. Hayes was retained by relator for purposes of presenting testimony at the VSSR hearing.
 {¶ 13} During direct examination, relator's counsel questioned Mr. Hayes regarding the torch that claimant used on the date of injury. The following exchange occurred:
Q. And in this particular case what type of head was used?
A. It was what I call a rosette heating head that's used merely to apply heat in a broad sense to a large area of metal.
Q. And how does that differ from a welding head?
A. Well, one thing the temperature ranges are different. With a welding and cutting head you can get up to 22, 2,300 degrees Fahrenheit. With a rosette type of a head if you can it get [sic] to a thousand degrees I would be surprised.
Q. And again, what is the difference between the rosette that was used in this particular claim and a cutting torch tip?
A. The size. You can — with a rosette type head you get a very large what they call a flame front and with a welding head it's a very narrow — about the size of a pencil and that's where you get the concentration of heat.
Q. And do you have an understanding of what the claimant was doing? What Mr. Jenkins was doing at the time of his alleged injury?
A. Yes.
Q. And what is that understanding, sir?
A. He was attempting to heat babbitt which is a lead aminomine material that's used in bearings to heat it up and remove it.
Q. And he was using the rosette heating tip?
A. Correct.
(Tr. 214-215.)
 {¶ 14} 9. During his testimony, Mr. Hayes referred to his report dated April 30, 2003, which is contained in the record. The report states in part:
On May 19, 2000, Mr. Roderick Jenkins (Claimant) was performing his normally assigned tasks at Cleveland Rebabbitting Services, Inc. (CRS) * * *. Mr. Jenkin's [sic] work consisted of using an oxygen-fuel gas supplied heating torch to heat up and melt old babbitt from large 400 pounds bearings commonly used in various manufacturing and utility industries. When in use, the bearings halves are cooled by means of coolant contained in a cavity or jacket that contains and circulates coolants. Removable threaded plugs in the bearings for filling the bearings with coolant and leak testing may or may not be installed when they are received by CRS. The bearings are leak tested by CRS to ensure the integrity of the cooling system before any other work is done. After leak testing, measuring and inspection, the bearings are trans-ported to the casting room for melting and removal of the old babbitt bearing material. After melting the old babbitt from the bearing halves, Mr. Jenkins would cast new bearings using new molten babbitt materials.
When Mr. Jenkins began heating the second half of the bearing with a Harris oxygen/fuel heating tipped torch, a rapid expansion of gases occurred causing the bearing to be blown across the room and causing Mr. Jenkin's [sic] injuires.
* * *
There is no evidence contained in the materials reviewed including photographs that indicates or leads one to conclude that the torch and other equipment failed or that the equip-ment had a causal relationship to the Claimant's injuries;
* * *
"Popping" sounds heard when using oxygen/fuel gas equipment is not an unusual event nor is it a precursor to a catastrophic failure of the equipment. To the contrary, popping sounds with oxygen/fuel gas torches is common with most torch equipment[.]
 {¶ 15} 10. During direct examination of Mr. Hayes, the following exchange occurred:
Q. Okay. Sir, in the course of your participation in this claim did you come to an opinion as to whether there was any equipment failure in this industrial injury?
A. Based on what I read in the expert reports from SAC who looked — did a forensic examination of the artifacts of the event I could only conclude and based upon on [sic] my review of the photographs that there was no equipment failure other than the bearing itself.
Q. And other than the bearing itself what do you mean by that, sir?
A. Well, the artifacts that were left and then the injury suffered by Mr. Jenkins and his clothing, et cetera, would indicate a rapid expansion of water that was heated inside the bearing in a failure in the bearing itself.
(Tr. 220-221.)
 {¶ 16} 11. Following the August 12, 2003 hearing, the SHO issued an order granting the VSSR application. The SHO's order states:
The injured worker was employed on the date of injury noted above by the Employer as factory worker; that the injured worker sustained an injury in the course of and arising out of employment when an explosion occurred in his welding torch, which ultimately caused the loss of his leg and catastrophic amputation of fingers on his right hand.
* * *
The Staff Hearing Officer finds that the injury was the result of the employer's failure to verbally and through demonstration instruct the employee in the safe operation and maintenance of cutting and welding equipment, as required by [4121]:1-5-16(C)(1), the Code of Specific Safety Requirements of the Industrial Commission relating to Cutting and Welding and the employer's failure to instruct the claimant to close valves on oxygen and acetylene cylinders and bleed off hose pressure at the end of each work shift, to prevent malfunction of the regulators as required by 4121:1-5-16 E (2)(d) the Code of Specific Safety Requirements of the Industrial Commission relating to Cutting and Welding.
Claimant's injuries were also a result of the employer's violation of 4121:1-5-16(E)(3)(a)(ii) which requires any length of hose in which a flash has occurred and burned in the hose to be taken out of service.
* * *
It is the finding of the Staff Hearing Officer that the employer violated 4121:1-5-16(C)(1), 4121:1-5-16(E)(3)(a)(ii), and 4121:1-5-16(E)(2)(d).
* * *
The request to dismiss the BWC Supplement Report dated 05/22/03 is denied for the reason the employer has failed to provide a legal reason to not consider this report. Granted the existence of a second, `supplemental' BWC Investigative report is unusual. Yet it may be considered and its value weighed along with the other evidence submitted.
The following are the reasons for granting the claimant's VSSR application filed 11/28/01.
Regarding the claimant's allegation that the injury was the result of the employer's failure to verbally and through demon-stration instruct the employee in the safe operation and maintenance of cutting and welding equipment, as required by 4121:1-5-16(C)(1), the code of Specific Safety Require-ments of the Industrial Commission relating to Cutting and Welding, the SHO found the following evidence persuasive.
The claimant testified that he had no formal training. He was not sent to any school, was not required to have any degree in welding, and was not even provided the instruction manual that the manufacturer provided with the torch.
Claimant's training consisted of watching a co-worker operate the torch.
There is no evidence that this co-worker was ever properly trained to operate the torch and in fact the opposite is more likely. Claimant then took that co-worker's position and began use of the torch. He was never instructed on the proper start up or shut down procedures or sequence. He testified he was told how to light the torch and adjust the flame by a supervisor but there is some confusion as to whether those instructions were proper.
Claimant testified that he experienced numerous problems with the torch, e.g. backfires; but because of his lack of training, he was unsure as to what was a problem and what was normal operating procedure. Whenever the claimant experienced a problem that he could not correct, he told a supervisor who would do his best to solve the problem without any input or consultation from the claimant.
Regarding the proper maintenance of the equipment, the claimant testified that since he was never properly trained on the operation, he was unsure regarding proper maintenance. Maintenance was not his responsibility. His supervisor would replace a part only when it failed as opposed to any regular replacement or inspection regarding the torch or hoses.
The Staff Hearing Officer finds that this lack of instruction on the safe operation of the welding equipment was the proxi-mate cause of the hose exploding causing claimant's injuries.
Claimant also alleges that the employer's failure to instruct the claimant to close valves on oxygen and acetylene cylinders and bleed off hose pressure at the end of each work shift, to prevent malfunction of the regulators as required by 4121:1-5-16(E)(2)(d) the Code of Specific Safety Requirements of the Industrial Commission caused the hose of the torch to ex-plode.
The Staff Hearing Officer notes the testimony of the claimant and the evidence relied upon to support claimant's first allegation, also supports this violation.
Claimant was never told the proper use of the valves and basically never touched them. Thus, whether the valves were properly set on that day is unknown.
Regarding the violations of 4121:1-5-16E(3)(a)(ii) which re-quires any length of hose in which a flash has occurred and burned in the hose to be taken out of service, the Staff Hearing Officer relies upon the testimony of the claimant that hoses were rarely changed, that they were not changed on any regular basis and basically were only changed once they became inoperable.
The employer raised the argument that the section that the claimant alleges was violated, refers to Welding and Cutting. They argue that the claimant was doing neither. He was heating metals.
A review of the definition section in the code fails to provide any definition for welding or cutting. A review of Webster's New World Dictionary, Second Edition, defines weld, as, "to unite by heat until molten and fused soft enough to hammer or press together". In addition, the rule refers to welding and cutting" equipment" which the claimant was operating while heating the babbitt metal.
The Staff Hearing Officer finds that the claimant's job duties of using a proplyene [sic] torch to soften and melt the babbit metal falls within the scope of the rule.
The employer also argued that what exploded was not the torch or hose as the claimant alleges, but rather the bearing that the claimant was heating.
The Staff Hearing Officer finds this argument not persuasive based upon the reports of Dr. Jordan dated 11/15/2002 who concludes that it was his opinion that the "injury pattern seen in the right hand was consistent with an explosive blast injury at close range" as opposed to a shrapnel injury which the employer's experts contend.
This opinion is also consistent with the opinion of Donald Lynn who in his 07/15/02 report concludes, "In my opinion this torch was subject to backfiring because of a combination of torch starvation and obstructed flow due to poor set up and a dirty torch. This situation lead to a flashback that was the cause of the accident."
For all the above reasons, the claimant's VSSR application filed 11/28/01 is granted.
 {¶ 17} 12. Relator moved for rehearing pursuant to Ohio Adm. Code 4121-3-20(C).
 {¶ 18} 13. On November 13, 2003, another SHO mailed an order denying rehearing.
 {¶ 19} 14. The record contains a report from Donald L. Lynn dated July 15, 2002, which is referenced in the SHO's order of August 12, 2003. The July 15, 2002 Lynn report was prepared by Barckhoff Welding Management for claimant's attorney. According to the report, Lynn is qualified to render an opinion based upon his "welding engineering education" and his 30 years of experience in the welding industry.
 {¶ 20} 15. In his July 15, 2002 report, Lynn opines:
* * * The torch used by Mr. Jenkins was a oxy-fuel torch set up for doing heating. This torch consisted of a 43-2 Harris high capacity combination handle with FlashGuard check valves. The mixing chamber is an F-43 for cutting and heating applications. The tip tube is a 2393-3F that measures 16" in length. The tip could only be identified from literature on the torch and the general configuration of the physical tip as a 2290-5HPM. This identification could not be made from the markings on the tip as was done for the other torch parts due to the deteriorated condition of the tip and the amount of foreign matter coating the entire surface of the tip.
* * *
* * * The evidence shows during the inspection that the torch was in very unacceptable condition for use as a heating torch. The torch had been reported to have been backfiring and leaking gas, both of which are unacceptable conditions for continue [sic] service without a resolution of these problems.
Cleveland Rebabbitting did not properly develop safety procedures and instructions and provide a safe workplace or train Mr. Jenkins to follow those procedures/instructions; nor did they provide competent supervision in the execution and enforcement of those safety procedures and instructions. This was amply shown by the facts that show that there were no written safety procedures or instructions for the correct oper-ation of the torch. The training that Mr. Jenkins received showed that even those doing the training did not know the correct instructions for the torch operation. The workplace had several recognizable safety concerns that were ongoing but never corrected by the company.
* * * Cleveland Rebabbitting knew from the backfiring that the torch was not operating properly and that previous backfiring had lead [sic] to a torch explosion. The company knew that extracting molten babbitt from a bearing using a high capacity heating torch is dangerous and can only be done safely by following all the recommended safety instructions for safe setup, operations and maintenance of the torch equipment. None of this was done, the setup was incorrect, the training was inadequate and the maintenance improper.
Backfiring is a serious condition when it occurs with any kind of heating, welding or cutting torch. There are no recognized knowledgeable sources that instructs a user experiencing this problem to just not worry about it and get back to work. All of these sources know that backfires can lead to flashbacks and those are the leading cause of accidents involving torch operators, and with all this Cleveland Rebabbitting choose [sic] to ignore the problem and continue doing business as usual.
In my opinion this torch was subject to backfiring because of a combination of torch starvation and obstructed flow due to poor set up and a dirty torch. This situation lead [sic] to a flashback that was the cause of the accident.
 {¶ 21} 16. The record contains a report (referenced in the SHO's order) dated November 15, 2002, from surgeon Roderick B. Jordan, M.D.:
* * * The hand injury was extensive. The index finger was traumatically amputated at a level just distal to the proximal interphalangeal joint. The middle finger had an open proximal interphalangeal joint with radial collateral ligament tear. The ring fingertip was destroyed. The little finger had a distal interphalangeal open dislocation. There was also a closed fracture of the 5th metacarpal base. All open wounds were sequentially debrided. During the debridement of the middle finger small fragments of metal were removed. * * *
* * *
With respect to his right hand, it is my opinion within a reasonable degree of medical certainty that the injuries I treated on May 19, 2000 were directly related to the reported industrial accident involving Mr. Jenkins on that day. It is also my opinion that the injury pattern seen in the right hand was consistent with an explosion blast injury at close range.
 {¶ 22} 17. The record also contains a report from FTI/SEA Consulting dated August 14, 2002, that was prepared for relator. The FTI/SEA report contains the analysis and opinion of senior analyst Robert S. Carbonara, Ph.D. The report indicates that the torch at issue was examined by Peter E. Susey, a senior project engineer for FTI/SEA. In his affidavit, Susey opined:
* * * [I]t is my opinion to a reasonable degree of engineering probability, that the torch Mr. Jenkins was using to remove the Babbitt from the fan bearing was not the cause of the explosion which knocked Mr. Jenkins to the floor and which caused the bearing to move approximately 15 feet. Instead, the fan bearing itself was the cause of the explosion and it was shrapnel from the bearing that caused Mr. Jenkins' impact wounds, rather than a gaseous explosion from the torch that could not possibly have caused the injuries to Mr. Jenkins, nor the damage to the bearing.
The FTI/SEA report of August 14, 2002, is critical of the July 15, 2002 Lynn report (Barckhoff Welding Management report).
 {¶ 23} 18. On April 16, 2005, relator, Cleveland Rebabbitting Service, Inc., filed this mandamus action.
Conclusions of Law:
 {¶ 24} Given the undisputed fact that claimant used the torch for heating the babbitt, but not for cutting or welding, the issue preliminarily is whether that fact renders inapplicable any of the three safety rules the commission found relator to have violated.
 {¶ 25} As to the preliminary issue [LH1], the magistrate finds that Ohio Adm. Code 4123:1-5-16(E)(2)(a) is rendered inapplicable because claimant was neither a "cutter" nor a "welder" within the plain meaning of the safety rule. However, the other two safety rules are not rendered inapplicable even though claimant did not use the torch for cutting and welding. The magistrate's finding as to the preliminary issue will be more fully explained below.
 {¶ 26} Given the magistrate's findings with respect to the preliminary issue, the additional issues are whether there is some evidence supporting the commission's finding that relator violated Ohio Adm. Code 4123:1-5-16(C)(1) and4123:1-5-16(E)(3)(a)(ii) and that the violations proximately caused the industrial injury. The magistrate finds that there is some evidence supporting the commission's finding that those two safety rules were violated and caused the industrial injury.
 {¶ 27} The remaining issue is whether the commission abused its discretion in refusing to eliminate the SVIU supplemental report of May 22, 2003, from evidentiary consideration. On that issue, the magistrate finds no abuse of discretion.
 {¶ 28} Because the commission did abuse its discretion in finding a violation of Ohio Adm. Code 4123:1-5-16(E)(2)(a) where the undisputed facts rendered the rule inapplicable, this action must be remanded to the commission for a redetermination of the percentage penalty to be imposed on relator for violation of the two safety rules that caused claimant's industrial injury.
 {¶ 29} Ohio Adm. Code Chapter 4123:1-5 sets forth specific safety requirements for workshops and factories. Ohio Adm. Code4123:1-5-16 is titled "Cutting and welding."
Ohio Adm. Code 4123:1-5-16(C)(1) states:
(C) Responsibility.
(1) The employer shall verbally and through demonstration in-struct the employee in the safe operation and maintenance of cutting and welding equipment.
Ohio Adm. Code 4123:1-5-16(E)(2)(d) states:
(E) Gas welding and cutting.
* * *
(2) Cylinders and containers.
(d) Regulator protection.
Welders and cutters shall be instructed to close valves on oxygen and acetylene cylinders and bleed off hose pressure at the end of each workshift, to prevent malfunction of the regulators.
Ohio Adm. Code 4123:1-5-16(E)(3)(a)(ii) states:
(3) Hose and hose connections.
(a) Hose.
* * *
(ii) Hose in which flashback has occurred.
Any length of hose in which a flashback has occurred and burned in the hose shall be taken out of service.
 {¶ 30} Regarding the preliminary issue, the initial inquiry is how Ohio Adm. Code 4123:1-5-16's title "Cutting and welding" may limit the scope of any of the three safety rules at issue. In that regard, State ex rel. Devore Roofing and Painting v. Indus.Comm., 101 Ohio St.3d 66, 2004-Ohio-23, is instructive.
 {¶ 31} In Devore, the employer was found to have violated Ohio Adm. Code 4121:1-3-07(E), which pertains to the operation of cranes, derricks, "or any other type of hoisting apparatus or construction equipment" in proximity to overhead electrical conductors. In Devore, the claimant, who was employed as a roofer, was electrocuted when a piece of aluminum downspout that he was maneuvering for installation on a building contacted an overhead electric power line. The force of the shock propelled the claimant over a guarded side of the scaffold upon which he was working, and he fell at least 25 feet to the ground.
 {¶ 32} The issue in Devore was whether Ohio Adm. Code4121:1-3-07(E) applied to stationary scaffolding. That safety rule is found under Ohio Adm. Code 4121:1-3-07, which is titled "Cranes, hoists and derricks." The Devore court observed:
* * * [T]he text of Ohio Adm. Code 4121:1-3-07(E) expressly exceeds the parameters of its title by imposing requirements not only on cranes, hoists, and derricks, but additionally on any type of construction equipment, including specifically all scaffolds and platforms used in connection with construction operations.
Id. at ¶ 27.
 {¶ 33} Notwithstanding the title of Ohio Adm. Code4121:1-3-07, the Devore court held that Ohio Adm. Code4121:1-3-07(E):
* * * [P]lainly and unequivocally apprises the employer that it has certain legal obligations to its employees when it is necessary to move or operate any type of construction equipment, including scaffolds, within ten feet of an electrical conductor carrying at least 110 volts of electricity. * * *
Id. at ¶ 30.
 {¶ 34} In so holding, the Devore court, having reviewed three cases cited by the employer, stated:
These cases do not hold, however, that the text of a safety rule may never exceed the scope of its title, nor do they require that safety rules must have all-encompassing titles. * * *
Id. at ¶ 26.
 {¶ 35} Given the guideline for analysis provided by theDevore court, this magistrate concludes that the title "Cutting and welding" of Ohio Adm. Code 4123:1-5-16, does not render Ohio Adm. Code 4123:1-5-16(C)(1) inapplicable to the instant case even though claimant did not use the torch for cutting or welding. Again, Ohio Adm. Code 4123:1-5-16(C)(1) states:
(C) Responsibility.
(1) The employer shall verbally and through demonstration instruct the employee in the safe operation and maintenance of cutting and welding equipment.
 {¶ 36} As the SHO's order of August 12, 2003 finds, claimant was operating welding and cutting equipment while heating the babbitt even though he was not actually engaged in cutting or welding. The question here is whether there is some evidence to support the finding that the torch at issue can be viewed as either welding or cutting equipment.
 {¶ 37} According to the FTI/SEA report prepared for relator, "[t]he torch used by Mr. Jenkins is a 43-2 Harris, high-capacity handle, with FlashGuard check valves on the oxygen and gas lines." The report also notes "[t]he mixing chamber is an F-43." According to the FTI/SEA report, "[t]he general configuration of the tip identifies it as a heating, rather than a cutting tip."
 {¶ 38} According to the July 15, 2002 Lynn report prepared for claimant (as previously noted): "This torch consisted of a 43-2 Harris high capacity combination handle with FlashGuard check valves. The mixing chamber is an F-43 for cutting and heating applications."
 {¶ 39} In the May 22, 2003 supplemental report filed by the SVIU investigator, the torch inspected is identified as the "Harris model 43-2, gas welding torch."
 {¶ 40} There is indeed no dispute in this action that the torch at issue is a Harris 43-2 torch. There is no dispute that the torch at issue has an F-43 mixing chamber. There is also no dispute that the torch at issue was fitted with a heating head or tip rather than a welding or cutting head.
 {¶ 41} There is clearly some evidence that the Harris 43-2 torch can be used for welding, cutting or heating. In fact, Lynn specifically stated: "The mixing chamber is an F-43 for cutting and heating applications." In his supplemental report, the SVIU investigator repeatedly identifies the torch as a "Harris gas welding torch."
 {¶ 42} Given that the Harris 43-2 torch is a multi-purpose torch adapted and used for heating at the time of the injury, it can be viewed as "Cutting and welding equipment" within the meaning of Ohio Adm. Code 4123:1-5-16(C)(1). Moreover, none of relator's experts ever claimed that the Harris 43-2 torch could not be used for either cutting or welding.
 {¶ 43} Regarding the preliminary issue, the magistrate concludes that Ohio Adm. Code 4123:1-5-16(C)(1) is not rendered inapplicable because the torch was being used for heating rather than cutting or welding at the time of the injury.
 {¶ 44} Under the preliminary issue, the magistrate shall now analyze Ohio Adm. Code 4123:1-5-16(E)(3)(a)(ii) which again states:
(E) Gas welding and cutting.
* * *
(3) Hose and hose connections.
(a) Hose.
* * *
(ii) Hose in which flashback has occurred.
Any length of hose in which a flashback has occurred and burned in the hose shall be taken out of service.
 {¶ 45} Ohio Adm. Code 4123:1-5-16(E)(3)(a)(ii) places a duty upon the employer to remove from service any length of hose in which a flashback has occurred and burned in the hose. This rule specifies a duty with respect to a specific item of cutting and welding equipment. Whereas, Ohio Adm. Code 4123:1-5-16(C)(1) places a responsibility on the employer to instruct the employee in the safe operation and maintenance of cutting and welding equipment, Ohio Adm. Code 4123:1-5-16(E)(3)(a)(ii) imposes a specific require-ment as to the hose of the equipment. Clearly, when the rule is read in context under Ohio Adm. Code 4123:1-5-16, it is fully applicable to the instant case even though the torch was being used for heating rather than cutting or welding.
 {¶ 46} As alluded to earlier, Ohio Adm. Code4123:1-5-16(E)(2)(d) presents a different problem:
(E) Gas welding and cutting.
* * *
(2) Cylinders and containers.
(d) Regulator protection.
Welders and cutters shall be instructed to close valves on oxygen and acetylene cylinders and bleed off hose pressure at the end of each workshift, to prevent malfunction of the regulators.
 {¶ 47} There is no dispute here that claimant was not employed as a welder or cutter. The rule specifically commands how the employer shall instruct "welders and cutters." Given the plain meaning of the rule, it is clearly inapplicable to the instant case. Accordingly, the commission abused its discretion by finding a violation of Ohio Adm. Code 4123:1-5-16(E)(2)(d).
 {¶ 48} As previously noted, given the magistrate's findings with respect to the preliminary issue, the additional issues are whether there is some evidence supporting a commission finding that relator violated Ohio Adm. Code 4123:1-5-16(C)(1) and4123:1-5-16(E)(3)(a)(ii) and that the violations proximately caused the industrial injury.
 {¶ 49} The magistrate will first address the commission's finding that relator violated Ohio Adm. Code 4123:1-5-16(C)(1). In that regard, the SHO's order states in pertinent part:
Regarding the claimant's allegation that the injury was the result of the employer's failure to verbally and through demon-stration instruct the employee in the safe operation and maintenance of cutting and welding equipment, as required by 4121:1-5-16(C)(1), the code of Specific Safety Require-ments of the Industrial Commission relating to Cutting and Welding, the SHO found the following evidence persuasive.
The claimant testified that he had no formal training. He was not sent to any school, was not required to have any degree in welding, and was not even provided the instruction manual that the manufacturer provided with the torch.
Claimant's training consisted of watching a co-worker operate the torch.
There is no evidence that this co-worker was ever properly trained to operate the torch and in fact the opposite is more likely. Claimant then took that co-worker's position and began use of the torch. He was never instructed on the proper start up or shut down procedures or sequence. He testified he was told how to light the torch and adjust the flame by a supervisor but there is some confusion as to whether those instructions were proper.
Claimant testified that he experienced numerous problems with the torch, e.g. backfires; but because of his lack of training, he was unsure as to what was a problem and what was normal operating procedure. Whenever the claimant experienced a problem that he could not correct, he told a supervisor who would do his best to solve the problem without any input or consultation from the claimant.
Regarding the proper maintenance of the equipment, the claimant testified that since he was never properly trained on the operation, he was unsure regarding proper maintenance. Maintenance was not his responsibility. His supervisor would replace a part only when it failed as opposed to any regular replacement or inspection regarding the torch or hoses.
The Staff Hearing Officer finds that this lack of instruction on the safe operation of the welding equipment was the proxi-mate cause of the hose exploding causing claimant's injuries.
 {¶ 50} According to relator, "[t]he evidence in this claim clearly demonstrates that Jenkins received adequate instruction by Dave Martin, Kevin Squires and other employees." (Relator's brief, at 21.)
 {¶ 51} Dave Martin was claimant's supervisor at the foundry. (Tr. 44, 46.) Martin was not called by relator to testify on relator's behalf at the hearing. However, claimant's testimony is relevant.
 {¶ 52} At pages 55 through 58 of the transcript, claimant testified about Martin's response to the repeated backfiring of the torch:
Q. * * * Now, during the time that you were there doing this torch and using these torches tell us what would occur with the torch.
A. The torch — the biggest torch was the propylene torch. All of the torches they would backfire frequently.
Q. Wait a minute. What [do] you mean by backfire?
A. Like loud noises when you — sometimes you could turn them off, pow. Sometimes you could just be using the big torch that I was using at the time of my injury frequently and I mean frequently would just — you could be heating some-thing up and it just go on and you'd just hear like a machine gun fire pow, pow, pow, like that.
Q. And when that occurred did it — it was —
A. It would startle everybody in the whole building even in the office because it was that loud.
Q. Would you tell somebody about that?
A. Yeah, I would ask Dave Martin about it quite frequently and he was like there's nothing wrong with it, go back to work. I didn't know any better because nobody told me any better.
Q. Well, when those pow, pow, those loud explosions would occur — when those loud explosions would occur, did you suspect something was wrong with the torch?
A. Well, I didn't have any knowledge of this kind of equipment but I assume it wasn't supposed to be doing that. That's why I asked quite frequently when this happened what's going on with the torch.
Q. So you would report it to Mr. Martin?
A. I reported to Mr. Martin at least three or four times a week if not more.
Q. The torch you used and the torch that's at question here is that the same torch you used for the whole year and a half that you were there?
A. It's the exact same one. Nothing on that particular torch has ever been changed since I started working there. Not nothing. The hoses had been changed maybe one time and that was early in my employment. The rest of the torch tip, handle, nozzle, all the same from the day I started.
 {¶ 53} Kevin Squires testified at the hearing on behalf of relator. According to Squires, he is now the shop foreman. (Tr. 148.) He replaced Martin as shop foreman after relator fired Martin for reasons unknown to Squires. (Tr. 181.) Martin was Squires' supervisor in May 2000 at the time of claimant's injury. Prior to claimant's injury, Squires was considered to be "second in command in the shop" when Martin was not there. (Tr. 152.)
 {¶ 54} According to Squires, Martin was in charge of maintenance of the torches on the date of injury. (Tr. 157.) However, Squires also performed routine maintenance on the torches. Squires would sometimes tighten the connections on a torch. (Tr. 157.) He would replace a hose if it were found to be defective. (Tr. 158.) According to Squires, Martin routinely inspected the torch. (Tr. 165.) Squires testified that he had no know-ledge that the torch at issue was not working properly prior to the injury. (Tr. 166.) Squires also testified that there would be gas leakage that could be smelled when couplings would loosen. When that occurred, "we tightened them up." (Tr. 171.)
 {¶ 55} It is the commission that weighs the evidence before it. Even if it can be argued that, viewing the evidence in a light most favorable to relator, the evidence could support a finding that claimant received adequate instruction and that the torches were adequately maintained, relator has not shown an abuse of discretion by the commission. Clearly, the commission, as the trier of fact, could view the evidence as showing that claimant was inadequately instructed by relator in the safe operation and maintenance of the torch that injured claimant on May 19, 2000.
 {¶ 56} Given the commission's finding that it was the torch that injured claimant, that the torch was inadequately maintained, and that claimant was inadequately instructed as to the safe operation and maintenance of the torch, proximate cause clearly follows. Obviously, had claimant been adequately instructed as to the safe operation and maintenance of the torch, it can be inferred that he would not have used the torch on the date of injury in the state of malfunction that the evidence shows to have existed.
 {¶ 57} The magistrate shall next address the commission's finding that relator violated Ohio Adm. Code4123:1-5-16(E)(3)(a)(ii). In that regard, the SHO's order states in pertinent part:
Regarding the violations of 4121:1-5-16E(3)(a)(ii) which re-quires any length of hose in which a flash has occurred and burned in the hose to be taken out of service, the Staff Hearing Officer relies upon the testimony of the claimant that hoses were rarely changed, that they were not changed on any regular basis and basically were only changed once they became inoperable.
 {¶ 58} According to relator, there is no evidence to support the commission's finding that the torch hose exploded. (Relator's brief, at 23.) In support of this argument, relator points out that the torch hose was discarded by relator after the industrial injury and was never available for inspection by any of the experts of record. Relator claims that claimant never offered a theory as to how the injury occurred based upon a claim that the hose exploded.
 {¶ 59} Relator's argument ignores the cross-examination testimony of Richard Hayes wherein the following exchange occurred:
Q. I need to know though, have you ever seen a Harris torch explode? In all of your years of experience have you ever investigated an explosion by a torch like this? Tell the truth, Mr. Hayes.
A. A Harris torch?
Q. You know, a torch explode.
A. I've seen the remnants of torch failure.
Q. They can or can't they? You can have a flashback in these types of operations and the gas can be built up around and there can be an explosion, can't there, Mr. Hayes?
A. Not so much in the torch handle itself if that's what you're talking about. You don't have the containment that you need for that. You usually end up with some damage at the hose end or at the tip end.
(Tr. 250.)
 {¶ 60} Based upon the testimony of Hayes, the SHO could infer that the explosion occurred in the hose. That the hose was unavailable for inspection by the experts after the injury does not preclude the commission's inference that the hose exploded.
 {¶ 61} Citing to claimant's testimony, relator contends that there is no evidence to support a finding that a flashback had occurred in the hose. (Relator's brief, at 23.) The magistrate disagrees with relator's contention.
 {¶ 62} While claimant testified that he did not know what caused the explosion, relator's contention ignores the testimony of claimant's expert, Mr. Lynn. As previously noted, in his July 15, 2002 report, Lynn opined:
In my opinion this torch was subject to backfiring because of a combination of torch starvation and obstructed flow due to poor set up and a dirty torch. This situation lead [sic] to a flashback that was the cause of the accident.
 {¶ 63} Based upon the foregoing analysis, the magistrate concludes that there is some evidence supporting the commission's finding that relator violated Ohio Adm. Code4123:1-5-16(E)(3)(a)(ii) and that the violation caused the industrial injury.
 {¶ 64} The final issue is whether the commission abused its discretion by refusing to eliminate from evidentiary consideration the SVIU supplemental report of May 22, 2003.
Ohio Adm. Code 4121-3-20(A)(2)(a) states:
All amendments to an application for additional award for violation of a specific safety requirement filed after the invest-igation by the bureau shall be reviewed to determine if the amendment requires further investigation.
 {¶ 65} Citing the above-quoted provision of the Ohio Administrative Code, relator asserts that the commission lacked legal authority to accept the SVIU's supplemental report because the commission had denied claimant's motion to amend the VSSR application to add alleged violations of specific safety rules relating to personal protective equipment and because allegedly the supplemental investigation "was limited to the clothing Jenkins wore on the date of the industrial injury." (Relator's brief at 25.) Relator's argument lacks merit.
 {¶ 66} Parenthetically, the commission's response here to relator's argument is that it did not rely upon the SVIU's May 22, 2003 supplemental report and thus there can be no abuse of discretion. However, this magistrate cannot accept the commission's assertion that it placed no reliance upon the supplemental report. While the supplemental report is not specifically cited in the SHO's order of August 22, 2003, the supplemental report was highly relevant to the issue of whether the industrial injuries were caused by an exploding torch as claimed by the claimant or an exploding bearing as claimed by relator. The SVIU investigator's damage assessment as to the torch may have been persuasive to the commission on this issue. Moreover, the commission specifically denied relator's motion to eliminate the supplemental report from evidentiary con-sideration.
 {¶ 67} Clearly, relator is incorrect to assert that the supplemental report was limited to the inspection of claimant's clothing worn at the time of the accident.
 {¶ 68} Moreover, relator is incorrect in asserting that the SVIU investigator "on his own accord reopened the investigation." Relator's assertion simply ignores what the SVIU investigator reported in his September 17, 2002 report — that the Harris torch was not available during the on-sight visit because it was in the possession of claimant's attorney.
 {¶ 69} The September 17, 2002 report strongly suggests that the SVIU investigator felt that the investigation was not complete as of the release of his September 17, 2002 report. Thus, it should have been no surprise to relator that the SVIU investigator subsequently inspected the torch and issued a supplemental report.
 {¶ 70} Moreover, Ohio Adm. Code 4121-3-20(A)(3) specifically provides for pro-cedures "[w]henever further investigation is performed by the bureau regarding an alleged safety violation." Relator does not address Ohio Adm. Code 4121-3-20(A)(3) here.
 {¶ 71} The magistrate concludes that relator has failed to show an abuse of discretion by the commission with respect to its denial of relator's motion to eliminate the supplemental report from evidentiary consideration.
 {¶ 72} Here, the commission entered a penalty of 40 percent based upon its finding that relator had violated three specific safety requirements. As shown above, relator violated only two safety rules that proximately caused the injuries. Among the factors considered in determining the amount of a VSSR award are the seriousness and number of violations. State ex rel. MartinPainting Coating Co. v. Indus. Comm. (1997),78 Ohio St.3d 333, 343. Accordingly, the reduction in the number of violations requires that the commission reconsider its penalty. Id. See, also, State ex rel. Smith v. Huguelet (1991), 57 Ohio St.3d 1
 {¶ 73} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate that portion of its order finding that relator violated Ohio Adm. Code 4121:1-5-16(E)(2)(d) and that portion of its order assessing a penalty of 40 percent, and to enter an amended order that assesses an appropriate percentage penalty based upon relator's violations of Ohio Adm. Code4123:1-5-16(C)(1) and 4123:1-5-16(E)(3)(a)(ii).
/s/ Kenneth W. Macke
 KENNETH W. MACKE MAGISTRATE