[Cite as *State ex rel. Armstrong Steel Erectors, Inc. v. Indus. Comm.*, 2014-Ohio-2616.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [State of Ohio ex rel.] | : | |
| Armstrong Steel Erectors, Inc., | | |
| | : | |
| Relator, | | |
| | : | No. 13AP-190 |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio | | |
| and Frank P. Seidita, | : | |
| | | |
| Respondents. | : | |

D E C I S I O N

Rendered on June 17, 2014

*ICE MILLER*, *LLP*, and *Corey V. Crognale*, for relator.

*Michael DeWine*, Attorney General, and *Kevin J. Reis*, for respondent Industrial Commission of Ohio.

*Heller, Maas, Moro & Magill Co., L.P.A., Joseph A. Moro*, and *Robert J. Foley*, for respondent Frank P. Seidita.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

SADLER, P.J.

{¶ 1} In this original action, relator, Armstrong Steel Erectors, Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent Frank P. Seidita ("claimant") for an additional award for violation of a specific safety requirement ("VSSR") and to enter an order denying the application.

{¶ 2}   Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto.  The magistrate concluded that the commission did not abuse its discretion in granting claimant's application for an additional award for VSSR.  Accordingly, the magistrate recommended that this court deny the request for a writ of mandamus.

## I.  RELATOR'S OBJECTIONS

{¶ 3}   Relator presents the following objections to the magistrate's decision:

> [I.] The Magistrate's conclusion that the use of personal fall protection equipment was impractical is not supported by the record.  In fact, the record evidence reflects Seidita's own arguments that safety belts and lanyards were required.

> [II.] The Magistrate's failure to find unilateral negligence because Seidita did not "tie-off" constitutes an abuse of discretion as it authorizes employees to completely disregard the employer's stated safety rules and personal protection measures.

> [III.] The Magistrate's decision that Armstrong Steel violated OAC 4123:1-3-03(L)(3) must be overturned because Armstrong neither installed, owned, controlled nor was responsible for maintaining the chain link fencing that was involved in Claimant's injury.

## II.  DISCUSSION

### A.  First and Second Objections

{¶ 4}   In its first objection, relator contends that the record does not support the conclusion that the use of personal fall equipment was impractical.  In its second objection, relator contends that claimant was unilaterally negligent in failing to utilize personal fall protection equipment.

{¶ 5}   The arguments raised in relator's first and second objections are nearly identical to those raised and addressed by the magistrate.  In addressing these issues, the magistrate concluded that the commission did not abuse its discretion in determining, at the time of claimant's injury, the use of personal fall protection equipment was impractical and that relator did not comply with the applicable safety requirements as

defined by Ohio Adm.Code 4123:1-3-03(L)(3). The magistrate also found the commission did not abuse its discretion when it did not find, due to its previous determination that relator had not complied with the safety requirements at issue, that claimant was unilaterally negligent in failing to wear personal fall protection at the time of his injury. While relator continues to challenge these conclusions, for the reasons stated in the magistrate's decision, we reject relator's contentions and find no merit to relator's objections.

{¶ 6} Accordingly, relator's first and second objections to the magistrate's decision are overruled.

### B. Third Objection

{¶ 7} In its final objection, relator contends for the first time that, because it neither installed, owned, controlled, nor was responsible for maintaining the safety net involved in claimant's injuries, it cannot be held responsible for violating Ohio Adm.Code 4123:1-3-03(L)(3). Our review of the record reveals that relator did not raise this issue at the administrative level. Rather, the issue before the commission was specifically whether the safety net met the applicable safety standards.

{¶ 8} It is well-settled law that issues not raised administratively cannot be raised in a mandamus action. *State ex rel. Burns Internatl. v. Smith*, 10th Dist. No. 05AP-488, 2006-Ohio-6731, ¶ 3, citing *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78 (1997). As stated in *Burns Internatl.,* a failure to pursue this issue administratively "bars this court from addressing it de novo in this action." *Id.* at ¶ 3. Thus, because we find relator failed to raise this argument at the administrative level, relator is precluded from raising it here.

{¶ 9} Accordingly, relator's third objection to the magistrate's decision is overruled.

## III. CONCLUSION

{¶ 10} Upon review of the magistrate's decision, an independent review of the record, and due consideration of relator's objections, we find the magistrate has properly determined the pertinent facts and applied the appropriate law. We, therefore, overrule relator's three objections to the magistrate's decision and adopt the magistrate's decision

as our own, including the findings of fact and conclusion of law contained therein. Accordingly, the requested writ of mandamus is hereby denied.

*Objections overruled;*
*writ of mandamus denied.*

BROWN and CONNOR, JJ., concur.

_____

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [State of Ohio ex rel.] | : | |
| Armstrong Steel Erectors, Inc., | | No.  13AP-190 |
| | : | |
| Relator, | | (REGULAR CALENDAR) |
| | : | |
| v. | | |
| | : | |
| Industrial Commission of Ohio | | |
| and Frank P. Seidita, | : | |
| | | |
| Respondents. | : | |

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on January 13, 2014

---

*ICE MILLER, LLP,* and *Corey V. Crognale,* for relator.

*Michael DeWine*, Attorney General, and *Kevin J. Reis,* for respondent Industrial Commission of Ohio.

*Heller, Maas, Moro & Magill Co., L.P.A., Joseph A. Moro* and *Robert J. Foley,* for respondent Frank P. Seidita.

---

### IN MANDAMUS

{¶ 11} In this original action, relator, Armstrong Steel Erectors, Inc. ("relator" or "Armstrong"), requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent Frank P. Seidita for an additional award for violation of a specific safety requirement ("VSSR") and to enter an order denying the application.

Findings of Fact:

{¶ 12} 1. On April 23, 2009, Frank P. Seidita ("claimant") fell from a concrete bridge pier while employed by relator as an iron worker. The bridge runs U.S. Route 62 over Andrews Avenue in Youngstown, Ohio.

{¶ 13} A chain link fence had been installed aside the pier top on which claimant was working. However, there was a gap of six inches to one foot between the chain link fencing and the outermost edge of the work surface.

{¶ 14} At the time of his fall, claimant was not wearing personal fall protection, i.e., personal protective equipment, even though that protection was readily available at the job site. As he was using a two-by-four to pry up a bearing pad he was about to weld, claimant lost his balance and fell through the gap to the ground below, a distance of over 25 feet. As a result of the fall, claimant sustained multiple fractures and other injuries.

{¶ 15} 2. On April 21, 2011, claimant filed an application for a VSSR award.

{¶ 16} 3. The VSSR application prompted an investigation by the Safety Violations Investigative Unit ("SVIU") of the Ohio Bureau of Workers' Compensation ("bureau").

{¶ 17} 4. On July 26, 2011, the SVIU investigator visited Armstrong's headquarters at Newark, Ohio. During the visit, the investigator met Armstrong's president, Diane Bednar. The investigator obtained company documents regarding the industrial accident.

{¶ 18} 5. Following a July 27, 2011 telephone interview, the SVIU investigator obtained an affidavit from claimant executed July 28, 2011:

> [Two] I began working at Armstrong Steel Erectors Incorporated approximately three weeks prior to my injury as an iron worker; this was my position at the time of my injury. My job duties consisted of steel construction, welding, and refurbishing bridges.
>
> [Three] I was not provided with any training from Armstrong Steel. I had completed an apprenticeship in 1994. I had also had completed the [OSHA] 10 hour course prior to working for Armstrong Steel Erectors. I believe Armstrong Steel conducted tool box talks or safety meetings at the beginning of the day; this was two years ago and I do not remember the issues discussed. Normally the talks consist of getting

enough water, tying off, safety glasses, and proper protective equipment.

[Four] At the time of my injury I was required to wear a welding hood, safety glasses, hard hat, leather welding gloves, and work boots. I was wearing these items at the time of my injury.

[Five] My injury occurred at on the US62 (Madison Freeway) bridge over Andrews Avenue. We were raising the bridge to install new bearing pads. I was under the bridge on a deck welding bearing pads in place. I was prying a bearing pad in order to weld the pad. I was using a two by four to pry the pad, the wood broke, I lost my balance, and fell.

[Six] The bridge pier had a safety net under it. There was a one foot gap between the safety net and the bridge pier and I fell through this gap. I do not know when the safety net was installed; it had been installed prior to me starting the job.

* * *

[Eight] At the time of my injury I was kneeling on the bridge pier. The bridge pier was approximately twenty-five feet wide and approximately three to four feet long. The bridge pier was approximately twenty-five feet six inches from the ground. I [fell] approximately twenty-five feet six inches landing on the concrete ground.

[Nine] The company provided safety harnesses, lifelines, and lanyards. Armstrong Steel Erectors only required employees to wear the fall protection when in an aerial lift. Since the safety net was installed Armstrong Steel Erectors did not require employees to wear the fall protection when on the bridge, pier, or decking. I was not required to wear fall protection at the time of my injury because of the safety net. At the time of my injury I was not wearing a safety harness.

[Ten] I had worn fall protection on this job whenever I was on the aerial lift. Prior to my injury I had been in the aerial lift approximately the day prior to my injury.

[Eleven] At the time of my injury there was not any place to tie off to had I chosen to wear fall protection. There was not any tie off cable and I could not have tied off to any steel at

the time of my injury. The X braces we normally use to tie off to had not yet been installed.

[Twelve] There was not any guard rail or toe board in the area where my injury occurred.

{¶ 19} 6. On November 7, 2011, at Armstrong's request, Craig S. Brue executed an affidavit, stating:

[One] I am a journeyman ironworker by trade and have been a member of the International Association of Ironworkers, Local 207, for the past eight years. Currently, I am jobsite foreman with Armstrong Steel Erectors ("Armstrong Steel") and am responsible for supervising its crews on road and bridge construction projects. As a journeyman ironworker, I have participated in job safety training programs, including the OSHA ten hour and the OSHA thirty hour competent person courses. I have participated in these safety training courses not only through my employment with Armstrong Steel, but also through my membership with Union Local 207. These safety programs cover OSHA's Subpart R. Subpart R covers safety requirements to protect ironworkers while performing steel erection activities.

[Two] Armstrong Steel has a written safety handbook that is maintained at our jobsites. In addition, Armstrong has a complete set of safety rules requiring proper safety practices required by OSHA standards for us to follow while performing steel erection work. One of my responsibilities as the jobsite foreman is to ensure that Armstrong Steel's safety program is carried out. As such, I discuss the Company's safety program beginning with our new hires and I continue discussing safety practices with my crew on a daily basis. One of Armstrong's safety rules requires the use of fall protection equipment. This rule requires us to be tied off with the use of a body harness and lanyard whenever work is being performed at a height of six feet or more. This is our 100% tie off rule.

[Three] Another part of Armstrong's safety program includes a weekly toolbox safety talk. Typically, I conduct the weekly employee safety talks on Monday mornings. Our talks cover safety topics including fall protection requirements, traffic hazards, slipping and tripping hazards, and the proper use of personal protective equipment. I held our weekly toolbox safety talks on our ODOT bridge project where Frank Seidita

was hurt. During those safety talks, I covered our safety rules regarding fall protection and the 100% tie-off rule. In addition, every day, I reminded my crew to use their fall protection equipment and to make sure they are always tied-off while working on the steel.

[Four] To monitor our safety program, Armstrong Steel has engaged a safety consultant who performs random field safety audits. The safety audits occur on a periodic basis at each of our jobsites. If a problem is identified, the safety consultant informs me and our structural steel manager, Russ Duskey, of the problem and we immediately address the problem or, if an issue cannot be taken care of immediately, I am required to clear the area or shut down operations.

[Five] We also enforce our safety rules with a disciplinary program that includes verbal and written reprimands, and if one of our journeymen fails to follow the Company's' [sic] safety rules, it could result in his or her suspension or termination. As the jobsite foreman, I have the authority to verbally warn my crew for any failure to follow our safety rules. I also remind the guys on a daily basis that they need to be tied off while working on the steel. I also conduct a pre-work safety check, which includes checking on my crew's fall protection equipment and making sure that they are wearing their full body harnesses properly. I inspect my crew's fall protection equipment to make sure it is in satisfactory condition and meets safety standards for strength and durability.

[Six] In this case, we were working as a subcontractor for A.P. O'Horo Company on an ODOT bridge project at U.S. Route 62 over Andrews Avenue in Youngstown, Ohio. The scope of our work included removing portions of the bridge, X-frames, bearings, and expansion joints. We also replaced X-frames, bearings, and expansion joints. For our project, Armstrong Steel furnished fall protection equipment for its workers. The fall protection equipment included safety harnesses, retractable lanyards, and bridge clamps for anchorage. I also hauled fall protection equipment in my utility truck. That equipment was also available for use by our crew.

[Seven] Our work on the project began the end of March, 2009. Frank Seidita was a part of our crew and he began

working at the project on April 7, 2009. At that time, I went through the new employee matters with Frank Seidita and observed his fall protection equipment to make sure it was adequate.

[Eight] Even though Armstrong Steel provides the necessary fall protection equipment, my crew owns and uses their own fall protection equipment. As noted, Frank Seidita had his own safety harness and lanyard and his safety harness was made to hook up to two safety lanyards. His safety harness enabled Mr. Seidita to comply with the Company's 100% tie-off rule when working on the steel.

[Nine] Mr. Frank Seidita was also a member of the Ironworkers' Local Union 207 and he has participated in the OSHA ten hours safety training courses. I also believe he has taken the OSHA 30 hour safety training course. Like me, Mr. Seidita, through his membership with Local Union 207, he has received safety training covering the OSHA standards, Subpart R for steel erection work, and, in particular, regarding OSHA's fall protection rules. In addition, I have worked with Mr. Seidita and have observed him following Armstrong's fall protection rules. Armstrong's fall safety rules require 100% tie-off while working on the steel six feet above ground or, if connecting, when they are more than two stories or thirty feet above ground. We are also required to be tied off while working in an aerial lift. I also reminded my crew on a daily basis to follow the 100% tie-off rule.

[Ten] In April, 2009, Frank Seidita was part of my work crew on the U.S. 62 ODOT bridge project over Andrews Avenue in Youngstown, Ohio. Mr. Seidita was well aware of Armstrong's fall protection rule and I made him aware of this protection policy during his safety orientation when he arrived on the jobsite. As I recall, I gave Mr. Seidita a copy of the Armstrong safety rules which identify the need to use fall protection equipment and to be tied-off 100% of the time. For this project, Mr. Seidita was required to wear his fall protection equipment, a welding hood, safety glasses, a hard hat, welding gloves, and work boots. Prior to his fall, I also conducted Armstrong's weekly toolbox safety talks and covered a variety of safety topics, which included our fall protection requirements and the need for 100% tie-off.

[Eleven] On April 23, 2009, Mr. Seidita was directed to weld bearing pads in place. This required him to work off of a

concrete bridge pier, which was approximately three feet wide and twenty-five feet long. Frank Seidita told me that he was using a two by four to pry up a bearing when the board broke causing him to lose his balance and fall between the safety net and the bridge pier. Mr. Seidita was not tied off at the time of his fall. This clearly was a violation of Armstrong's 100% fall protection tie-off rule.

[Twelve] At the time of his fall, Mr. Seidita was working alone and he could not be seen by me or the rest of my crew. We were installing expansion joints on the bridge decking above Mr. Seidita. I had no idea Mr. Seidita was violating our safety rules and his training by working without being tied-off. Had I observed Mr. Seidita performing any work at a height of more than six feet above ground and not being tied-off, I would have immediately instructed him to stop what he was doing and tie-off. Put simply, Mr. Seidita failed to follow our 100% tie-off rule on that jobsite and had he ever returned to work following his injury, he would have been disciplined. Also, if Mr. Seidita would have followed our safety rules and tied-off, he would not have fallen to the ground.

[Thirteen] I have reviewed Mr. Seidita's Affidavit and submit that it contains several misstatements. First, Seidita states that Armstrong Steel only requires employees to wear fall protection when they are in an aerial lift. That is clearly wrong. To the contrary, our 100% tie-off rule applies not only while in an aerial lift, but also whenever they are working at a height of more than six feet above ground or, if connecting, when they are more than two stories or 30 feet above a lower level. Mr. Seidita was not engaged in any connecting work at the time of his accident.

[Fourteen] On this project, there also was a safety net installed. The safety net was installed by American Bridge Painters, another contractor on the project. Our 100% tie-off rule also applies even when there is a safety net.

[Fifteen] I am also unclear as to what Mr. Seidita meant in his Affidavit that he was not required to wear fall protection equipment because there was a safety net. That is wrong. Mr. Seidita and the other members of our work crew were always required to wear their fall protection equipment whether they were working in the aerial lift, on sections of the bridge and regardless as to the safety net. Honestly, Mr. Seidita, for

reasons only known to himself, failed to tie-off. Had Mr. Seidita tied-off, he would not have fallen to the ground.

[Sixteen] I also submit that Mr. Seidita had ample opportunity to tie-off while performing the bearing installations. Mr. Seidita could have tied-off onto sections of the steel or he could have attached bridge clamps to the steel and then tie[d]-off on the bridge clamp. On this project, our crew had bridge clamps available for use. The clamps were stored in our mechanic truck and I even have bridge clamps and other fall protection equipment in the utility truck I drove to the project.

[Seventeen] I also note that Mr. Seidita was not working anywhere near what could be characterized as a floor opening or floor hole. Rather, he was working off a concrete bridge pier measuring three to four feet in width and twenty-five feet in length. The bridge pier was constructed of concrete and rose to a height running from twenty-five feet to fifteen feet. Obviously, there existed no opening whether it be floor, roof or wall in existence in which in [sic] any person or material could fall through.

[Eighteen] I also note that the steel safety netting was not a working or walking surface. The safety net was simply another fall protection measure. It was not temporary flooring, a platform, runway, nor any type of walking or working surface. Likewise, I was unaware of any hole or opening in the safety net. As to the slight gap between the safety net and the pier, I submit that this was not an opening in any walking or working space of any floor, wall or roof.

{¶ 20} 7. On November 18, 2011, at Armstrong's request, Diane Bednar executed an affidavit, stating:

[One] I am President of Armstrong Steel Erectors, Inc., and I am familiar with the workers' compensation claim and VSSR application of Frank P. Seidita. I am also familiar with the nature and scope of our work on the ODOT Bridge Project at U.S. Route 62 over Andrews Avenue in Youngstown, Ohio, where Mr. Seidita was injured.

[Two] We staffed that project with union ironworkers who were previously schooled in techniques and procedures associated steel erection operations and safety. Through the apprenticeship and the training programs sponsored by the

Union Locals, our ironworkers possessed the knowledge and understanding in the use, care, and maintenance of personal protective equipment, including fall protection. I submit that our ironworkers possess this knowledge and competency at the time they step on our job project.

[Three] It is also part of Armstrong Steel's safety program to provide ongoing training, supervision, and oversight covering the safety requirements associated with the performance of steel erection activities in accordance with OSHA's Subpart R.

[Four] Craig S. Brue, our jobsite foreman on the ODOT project, and the rest of the ironworkers on that project, including Frank D. [sic] Seidita, have participated in safety training courses, including, at a minimum, the OSHA 10 hours course and, the OSHA 30 hour competent person course. Additionally, Mr. Brue held weekly toolbox safety talks which covered a variety of safety topics including fall protection requirements, traffic hazards, slipping and tripping hazards, and the proper use of personal protective equipment. These weekly toolbox safety talks occurred throughout the course of Mr. Seidita's work on that project.

[Five] I reviewed Mr. Seidita's Affidavit and wish to set the record straight with respect to several statements. I will address these statement in the order made by Mr. Seidita.

[Six] First, American Bridge Painters installed a safety net in accordance with their obligations on this project. The safety net was a fall protection measure, as well as, a means of catching debris before it would fall to the ground. Even with a safety net, our safety program requires our workers to use their fall protection equipment and to be tied-off whenever they are working six feet above ground or, if performing connecting operations, when they are more than two stories or thirty feet above ground. If any of our ironworkers are engaged in those activities and not tied-off, they would be in violation of our 100% tie-off rule and subject to discipline. I submit that this duty applies whether or not a safety net has been installed.

[Seven] On the project where Mr. Seidita worked, as with all of our other projects, Armstrong Steel provided all the requisite fall protection equipment, including safety harnesses, retractable lanyards, and bridge clamps for

anchorage. All of this equipment was on the job site and readily available to all ironworkers.

[Eight] I am also familiar with the job activities that Mr. Seidita was performing on the concrete bridge pier at the time of his accident. In the performance of those activities, I submit that Mr. Seidita had options within which to properly use his fall protection equipment. Specifically, Mr. Seidita could have used a choker to wrap around the steel work of the bridge and hook to his lanyard or he could have used a bridge clamp and then be connected to the clamp. Mr. Seidita, however, for reasons only known to himself, failed to tie-off as required by our safety rules, and his reciprocal obligation under Ohio's specific safety requirements. Given Mr. Seidita's action, I submit that he would have been disciplined for this failure to follow our safety rules had he ever returned to work following his accident.

[Nine] I also note that it is a misstatement on the part of Seidita to state that Armstrong Steel only requires employees to wear fall protection equipment when in an aerial lift. As repeatedly noted above, this is incorrect and goes against our safety rules. I have attached a copy of our written safety rules.

[Ten] Finally, I submit that Mr. Seidita was working on a concrete bridge pier that did not constitute what could be characterized as a floor, roof, or wall opening that was required to be guarded or covered. Nor could the space between the bridge pier and the safety net be considered an opening in a floor, roof or wall.

{¶ 21} 8. On June 5, 2012, at claimant's request, Adam Shields executed an affidavit, stating:

My name is Adam Shields. I worked for Armstrong Steel Erectors on or around April 23, 2009. I am a journeyman iron worker and a member of the International Association of Ironworkers, Local 207.

I worked on the ODOT bridge project at U.S. Route 62 over Andrews Avenue in Youngstown, Ohio. On this job, safety fencing was used as fall protection. Static lines were not used on this job unless we were over railroad tracks where the fencing was never erected. The static lines are used for iron workers to tie off to while walking the iron. There were no

static lines in the area where Mr. Seidita fell. I remember on this job, we relied on the safety fencing as our primary fall protection.

{¶ 22} 9. On September 12, 2012, a staff hearing officer ("SHO") heard the VSSR application. The hearing was recorded and transcribed for the record.

{¶ 23} 10. At the September 12, 2012 hearing, early on, claimant tells the hearing officer how the accident occurred:

> HEARING OFFICER: For my benefit, would you define for me what a bridge pier is?
>
> THE CLAIMANT: Okay.
>
> HEARING OFFICER: I think I know what you're talking about, but I want to hear it from you so I make sure that --
>
> THE CLAIMANT: Well, it's the concrete part that holds up the bridge, the steel part of a bridge. It's just, you know, it's on either side of the freeway or the whatever, road or whatever.
>
> HEARING OFFICER: It's the pillars and they're connected across the top?
>
> THE CLAIMANT: Yeah, so the beams could go across the top of these piers.
>
> HEARING OFFICER: Uh-huh.
>
> THE CLAIMANT: They support the whole structure.
>
> HEARING OFFICER: Okay.
>
> A. I was working on top of one of those. And there's a fence or netting underneath us. And I was welding some bearing plates which the bridge bears on, the weight, okay, it takes the load of the bridge; I was welding some up, and I was prying on one to get it up against the steel so I could weld it. And there was tight steel to work with, and what I was prying with was a two-by-four. The two-by-four broke and it snapped, and I slipped off of it. And my foot went straight down through the -- the -- my work area, which is the fence I was working -- that was, you know, going underneath the bridge.

HEARING OFFICER: Uh-huh.

A. And I went through the hole and I just couldn't hold my weight up, and I completely went through the fence. There was a gap in there for whatever reason.

Q. (BY MR. MORO) Were you using any other personal protective equipment, and specifically I'm talking about a safety belt and a lanyard?

A. No, I was not.

(Tr. 197-99.)

{¶ 24} During direct examination by his counsel, claimant testified:

A. Where I was working, I was underneath the bridge, the deck over my head and the fence underneath me. And the whole time you're on this, you're working on your hands and knees and you never stand straight up. So you're always crawling or on your knees doing the work performed, so, in my situation. The people around me, there really wasn't any work that was being performed right on either side of me. I was by myself.

* * *

Q. Was it required on this job to wear a safety belt and a lanyard?

A. When?

Q. When you were on the net?

A. No.

(Tr. 201-03.)

{¶ 25} During claimant's cross-examination by Armstrong's counsel, the following exchange was recorded:

Q. Okay. And your affidavit indicates that on this job site where you were hurt, Armstrong Steel provided safety harnesses, lanyards, clamps to tie off on, lifelines?

A. They provided everything. I was -- you know, they would provide a welding hood if you needed one, which is

protective equipment. They had harnesses laying in the back of a truck somewhere, yes. I did use my own personal harness on that job when I was -- when I was told to or I knew I had to, working in the aerial lifts, 'cause I had been in the aerial lifts previously on that job.

Q. Okay.

A. This one didn't require it, so I didn't. I gathered, again, in the morning when I got to work, I gathered the tools that I needed for that particular job and went for it. A harness was not one of the safety things because there was no fear of falling.

* * *

Q. Okay. Now, you report, and let's go back to, at first you were telling the Hearing Officer you were working on the fencing, on the net; correct?

A. Yes, I may have said that.

Q. But what you did say originally under oath, and that is, at the time of your injury you were kneeling on the concrete pier; correct?

A. Yes.

Q. You were doing your work standing on the concrete pier?

A. Kneeling on the pier.

Q. I'm sorry, kneeling on the concrete pier?

A. And, yes.

Q. Okay. And that concrete pier you indicate was about 25 feet wide or long and either 3 or 4 feet wide or long, whatever you want to --

A. Yes.

* * *

Q. Okay. And apparently your attorney wants or you might have thought you now need to say you were working on the

fencing and saying there was a hole in the fencing; is that what your understanding is today?

A. I guess I didn't mention the complete description of, good enough, of the job; but the fence went up to the pier. The fencing or the netting or -- it's -- the fencing went up to the pier.

* * *

A. And I was welding. When the two-by-four that I was prying with snapped, my foot went off of the pier and onto the fencing, and it went through whatever gap was there and --

* * *

A. So I -- I was -- sometimes I was on the fencing, sometimes on the pier. To get to the pier, I was crawling on the fencing. And to get off of the pier, I would crawl back off the fencing.

(Tr. 222-26.)

{¶ 26} At the hearing, Russell Duskey testified on direct examination by Armstrong's counsel. The following exchange occurred:

Q. Was it Armstrong Steel's obligation under your contract with the general contractor, A.P. O'Horo, to put up the fencing?

A. No, it wasn't.

Q. Okay. And what function did the fencing serve?

A. Debris net primarily.

Q. And was the fencing the only fall protection in place on this project for Armstrong Steel workers?

A. Their individual fall protection was in place.

(Tr. 231.)

{¶ 27} At the hearing, Diane Bednar testified on direct examination by Armstrong's counsel:

Q. Okay. And after you learned about Mr. Seidita's accident, first of all, does Armstrong have a disciplinary policy in which, if someone violates a safety rule, they're disciplined?

A. We have a disciplinary policy. It's three steps; verbal, written, dismissal. Craig Brue would be implementing that, so he would have issued the verbal warnings as well as any other reprimands.

Q. And in this case, Mr. Seidita, if he would have come back to work at Armstrong Steel, would he have been disciplined for his actions?

A. He would have received a reprimand, yes.

Q. And the basis for the reprimand would have been?

A. Not being tied off.

Q. Okay. And on this project, this fencing that they keep referring to as the safety fencing, was that the primary means of fall protection for Armstrong?

A. It was one means, but it was not a primary.

Q. And the other means is?

A. 100-percent tie off.

(Tr. 243-44.)

{¶ 28} At the hearing, claimant testified on redirect examination by his counsel:

Q. Frank, you've heard the testimony and so forth. Is it fair to say that the employer allowed you to rely on the netting and fencing as fall protection?

A. Yes.

Q. And did you see other Armstrong employees at any time during your course of working on this job moving along on this fencing or walking along this fencing --

A. Absolutely.

Q. -- without safety nets or safety belts and lanyards?

A. Yes.

Q. Okay. So you saw other employees walking around on this stuff?

A. Well, just, you know, specifically, Craig Brue, the foreman on the job, to -- to like come up, instead of getting on an aerial lift or if there wasn't an aerial lift there, he came actually to the end of the bridge and crawled out on the fence just like I did to -- to come and show me what we were talking about. You know what I mean? He was my foreman; he showed me what to do. He wasn't in a harness when he came and crawled out on the fence. He didn't have a harness to throw on or there wasn't a lift available. He ran up to the abutment or wherever, the beginning of the bridge, got on the fence, crawled out there, and showed me what I was talking about.

Q. And he didn't wear -- he didn't have a safety belt and a lanyard on?

A. Absolutely not[.]

* * *

Q. When you were up there with Craig Brue and when he would see you up there, did he direct you to tie off when you were on this net?

A. Absolutely not. It was never a -- and I talked to him. I mean, 25 feet is about what I fell, just over 25 feet, and I talked to him on the -- on the ground. Or whoever else is on the ground, you talk, you communicate. Nobody's ever -- if people are -- you know, this is, and you understand, falling off -- tying off is a big deal in our business.

* * *

A. And each job, you know what I mean, if they would have said, you have to have your harness on when you're up on that safety net, then we would put our harness on. We actually had discussions and they said, when you're up on the fence you don't need your harness; that fence is there for fall protection.

(Tr. 245-48.)

{¶ 29} 11. Following a September 12, 2012 hearing, the SHO issued an order granting the VSSR application.  The SHO's order explains:

> [R]egulations 4123:1-3-03(C) (1) and 4123:1-3-03(J) (1-6) regarding personal protective equipment, safety belts, harness lifelines and lanyards were not required in this case as the regulations provide that safety nets may be used in lieu of lifelines and safety belts or harnesses. The Staff Hearing Officer relies upon Regulation 4123:1-3-03 (J) (7) and the undisputed testimony at hearing by the Injured Worker himself, stating that his work area on the date of injury was protected by safety netting.
>
> The Staff Hearing Officer finds that a V.S.S.R. award is deemed a penalty to the employer and therefore, is subject to a rule of strict construction with all reasonable doubts concerning the interpretation of the claim to be construed in favor of the employer. State ex rel. Burton v. Indus. Comm. (1989), 46 Ohio St.3d 170, State ex rel. Cincinnati Drum Service Inc. v. Indus. Comm. (1990), 52 Ohio St.3d 135. In other words, Specific Safety Requirements, being the basis for penalizing noncomplying employers, are to be construed, where reasonable, against applicability to the employer. State ex rel. G & S Metal Products, Inc. v. Moore (1997) 79 Ohio St.3d 471.
>
> That being said and acknowledging the multiple denials specified above, the Staff Hearing Officer finds that the Injured Worker has demonstrated by a preponderance of the evidence that Specific Safety Regulations 4123:1-3-03 (L) (1) (3) do apply to the facts at hand.
>
> These regulations provide as follows:
>
> (L) Safety nets.
>
> (1) Safety nets shall be provided when workplaces are more than twenty-five feet above the ground, water, or other surface where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines or safety belts or harnesses is impractical.
>
> (3) Safety nets shall extend outward from the outermost projection of the work surface in accordance with the following table to this rule and shall be installed as close under the work surface as practical but in no case more than

thirty feet below such work surface with the exception of bridge construction where only one level of nets is required. Nets shall be hung with sufficient clearance to prevent employee's contact with the surfaces or structures below. Such clearance shall be determined by impact load testing.

The Staff Hearing Officer finds that 4123:1-3-03 (J) (7) permitted the employer [of] record to substitute the use of a safety net in place of personal safety equipment.

Regulations 4123:1-3-03 (L) (1) and (L) (3) provide the duties imposed upon an employer for using a safety net.

The Injured Worker testified at hearing that his work area was merely a crawl space between the top of the bridge piers and the bottom of the bridge roadway section. While this crawl space area was said to be 25' wide by the Injured Worker, he also said it was at 3' to 4' long and 25' 6" high.

Given the Injured Worker's testimony as reflected in the hearing transcription regarding his description of attempting to weld plates together in this crawl space area that often required him to actually roll out onto the safety netting, the Staff Hearing Officer concludes that the use of personal protective equipment as described earlier, would be deemed to be impracticable [sic], as required by 4123:1-3-03 (L) (1).

Regulation 4123:1-3-03 (L) (3) provides in relevant part, that "safety nets shall be installed as close under the work surface as practical ... with the exception of bridge construction where only one level of nets is required. Nets shall be hung with sufficient clearance to prevent employees contact with the [surfaces] or structures below."

It is the finding of the Staff Hearing Officer that the Injured Worker was employed on the date of injury noted above, by the employer as an Iron Worker, and that the Injured Worker sustained an injury in the course of and arising out of employment when while attempting to weld on a bridge pier in a squatting position, the Injured Worker shifted his body to weld in a hard to reach area and in doing so, his foot slipped off the edge of the pier and thru the gap between the pier and safety netting, resulting in the Injured [W]orker falling approximately 25 1/2 feet to the ground below.

It is further the finding of the Staff [H]earing Officer that the Injured [W]orker's injury was the direct proximate result of stepping off the bridge pier into a gap area between the net and pier which was between six inches and one foot wide, which resulted in his entire body falling through the gap area, over 25 feet below. This gap area is found to violate Specific Safety Regulations 4123:1-3-03 (L) (1) and 4123:1-3-03 (L) (3), of the Code of Specific Requirements of the Industrial Commission relating to Construction.

The Staff Hearing Officer finds that the Injured Worker testified that the netting was similar to a chain link fence and was initially installed to abutt the top of the bridge pier. The Injured Worker also stated that the netting was installed prior to his employment on this job, so he didn't know who had installed the netting. The representatives of the employer testified that another subcontractor on the job had actually installed the netting.

It is therefore ordered that an additional award of compensation be granted to the Injured Worker in the amount of fifteen (15) percent of the maximum weekly rate under rule of State ex rel. Engle v. Industrial Commission, 142 Ohio St. 425.

{¶ 30} 12.  On November 19, 2012, relator and claimant each moved for rehearing pursuant to Ohio Adm.Code 4121-3-20(E).

{¶ 31} 13. On January 9, 2013, another SHO mailed an order denying the motions for rehearing.  The SHO's order explains:

It is hereby ordered that the Motions for Rehearing filed by the Injured Worker and by the Employer on 11/19/2012 be denied. Neither the Injured Worker nor the Employer has submitted any new and relevant evidence nor shown that the order of 09/12/2012 was based on an obvious mistake of fact or on a clear mistake of law.

Specifically, counsel for the Injured Worker alleged that other sections were violated and that the evidence would have supported a higher percentage than 15% but there was no further explanation or basis given.

Regarding the Employer's request for re-hearing, there was some testimony at the hearing which led the Staff Hearing Officer to the conclusion that use of standard lifelines and

> lanyards was impractical, thus requiring use of a safety net. The safety net or debris net under the Injured Worker clearly was not sufficient to prevent his fall. Even if use of the lifelines and lanyards was "practical," there was conflicting evidence and testimony as to whether or not their use was enforced 100 percent of the time at this job site by this Employer.
>
> As it is found that neither party has met the requirements of Ohio Admin. Code 4121-3-20(E) (1) (a) and (b), the requests for a VSSR re-hearing are denied.

{¶ 32} 14. On March 6, 2013, relator, Armstrong Steel Erectors, Inc., filed this mandamus action.

Conclusions of Law:

{¶ 33} Three issues are presented:  (1) whether the commission abused its discretion in determining that the use of personal fall protection was "impractical" within the meaning of the pertinent safety rule for working on the concrete pier at the time of injury, (2) whether the commission abused its discretion by not finding that claimant was unilaterally negligent in failing to wear personal fall protection at the time of his injury, (3) whether the specific safety rule, Ohio Adm.Code 4123:1-3-03(L)(3), prohibits the gap between the outermost projection of the work surface atop the concrete pier and the chain link fence (safety net)—the gap that claimant fell through at the time of his injury.

{¶ 34} The magistrate finds:  (1) the commission did not abuse its discretion in determining that the use of personal fall protection was "impractical" within the meaning of the pertinent safety rule for working on the concrete pier at the time of injury, (2) the commission did not abuse its discretion in failing to find that claimant was unilaterally negligent in failing to wear personal fall protection at the time of his injury, and (3) the specific safety rule, Ohio Adm.Code 4123:1-3-03(L)(3), did prohibit the gap between the outermost projection of the work surface atop the concrete pier and the chain link fence (safety net)—the gap that claimant fell through at the time of his injury.

{¶ 35} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

## Basic VSSR Law

{¶ 36} It is well-settled that a VSSR award is deemed a penalty to the employer subject to the rule of strict construction with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer. *State ex rel. Watson v. Indus. Comm.*, 29 Ohio App.3d 354 (10th Dist.1986); *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989).

{¶ 37} It is also firmly established that the determination of disputed factual situations as well as the interpretation of a specific safety requirement is within the final jurisdiction of the commission, and subject to correction in mandamus only upon a showing of an abuse of discretion. *State ex rel. Roberts v. Indus. Comm.*, 10 Ohio St.3d 1 (1984); *State ex rel. Allied Wheel Prods., Inc. v. Indus. Comm.*, 166 Ohio St. 47 (1956); *State ex rel. Volker v. Indus. Comm.*, 75 Ohio St.3d 466 (1996).

{¶ 38} Of course, the commission's authority to interpret its own safety rules is not unlimited. Strict construction does require that the commission's interpretation be reasonable. *State ex rel. Martin Painting & Coating Co. v. Indus. Comm.*, 78 Ohio St.3d 333, 342 (1997). The commission may not effectively rewrite its own safety rules when it interprets them. *State ex rel. Lamp v. J.A. Croson Co.*, 75 Ohio St.3d 77, 81 (1996).

{¶ 39} Specific safety requirements are intended to protect employees against their own negligence and folly as well as provide them a safe place to work. *State ex rel. Cotterman v. St. Marys Foundry*, 46 Ohio St.3d 42, 47 (1989).

{¶ 40} The unilateral negligence defense to VSSR liability derives from *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.*, 37 Ohio St.3d 162 (1988), in which an employer was exonerated from VSSR liability because an employee had removed part of a scaffold that had been required by a specific safety requirement. *State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.*, 88 Ohio St.3d 190, 192 (2000).

{¶ 41} However, a claimant's alleged negligence is a defense only where the employer has first complied with relevant safety requirements. *State ex rel. Hirschvogel, Inc. v. Miller,* 86 Ohio St.3d 215, 218 (1999). A claimant's negligence bars a VSSR award only where the claimant deliberately renders an otherwise complying device noncompliant. *State ex rel. R.E.H. Co. v. Indus. Comm.,* 79 Ohio St.3d 352, 355, (1997); *Martin Painting* at 339.

**Applicable Commission Safety Rules**

{¶ 42} Ohio Adm.Code Chapter 4123:1-3 sets forth the commission's safety rules regarding "Construction Safety."

{¶ 43} Ohio Adm.Code 4123:1-3-03 is captioned "Personal protective equipment."

{¶ 44} Ohio Adm.Code 4123:1-3-03(A) is captioned "Scope."  The first paragraph thereunder provides:

> The requirements of this rule relate to the personal protective equipment listed immediately below, as required for employees on operations described in this rule in which there is a known hazard, recognized as injurious to the health or safety of the employee.

{¶ 45} Ohio Adm.Code 4123:1-3-03(B) sets forth definitions.  Thereunder, the code provides:

> (2) "Lanyard" means a flexible line of rope, wire rope, or strap which generally has a connector at each end for connecting the body belt or body harness to a life line or anchorage.
>
> (3) "Vertical Lifeline" means a rope, suitable for supporting one person, to which a lanyard or safety belt (or harness) is attached.

{¶ 46} Ohio Adm.Code 4123:1-3-03(C) is captioned "Specific requirements of general application."  Thereunder, the code provides:

> (1) Personal protective equipment furnished by the employer shall be issued to the employee in sanitary and proper condition so that it will effectively protect against the hazard involved.
>
> (2) Where employees provide their own protective equipment, such equipment shall give equal or greater protection than that furnished by the employer.

{¶ 47} Ohio Adm.Code 4123:1-3-03(J) is captioned "Safety belts, harness lifelines and lanyards."  Thereunder, the code provides:

> Lifelines, safety belts or harnesses and lanyards shall be provided by the employer, and it shall be the responsibility of

the employee to wear such equipment when exposed to hazards of falling where the operation being performed is more than six feet above ground or above a floor or platform * * *. Lifelines and safety belts or harnesses shall be securely fastened to the structure and shall sustain a static load of no less than three thousand pounds.

{¶ 48} Ohio Adm.Code 4123:1-3-03(J)(7) provides:

Safety nets may be used in lieu of lifelines and safety belts or harnesses.

{¶ 49} Ohio Adm.Code 4123:1-3-03(L) is captioned "Safety nets."  Thereunder, the code provides:

(1) Safety nets shall be provided when workplaces are more than twenty-five feet above the ground, water, or other surface where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines or safety belts or harnesses is impractical.

* * *

(3) Safety nets shall extend outward from the outermost projection of the work surface in accordance with the following table to this rule and shall be installed as close under the work surface as practical but in no case more than thirty feet below such work surface with the exception of bridge construction where only one level of nets is required. Nets shall be hung with sufficient clearance to prevent employee's contact with the surfaces or structures below.

### First Issue

{¶ 50} The commission determined that the safety rules required that safety nets be provided when the use of personal fall protection and other listed safety devices are "impractical."

{¶ 51} Here, the commission, through its SHO, determined that the use of personal fall protection was "impractical" and that relator was relying on the chain link fence as a safety net.

{¶ 52} According to relator, there exists no evidence that use of personal fall protection was impractical.  On the other hand, respondents contend that the commission relied upon some evidence showing that the use of personal fall protection

was "impractical" at the time of the accident.  The magistrate agrees with respondents and finds no abuse of discretion.

{¶ 53} In the SHO's order of September 12, 2012, the SHO identifies specifically the evidence relied upon to support the finding that the use of personal fall protection was impractical.  The SHO finds that claimant was required to weld in a "crawl space between the top of the bridge piers and the bottom of the bridge roadway section." Further, the SHO found that relator's job on the date of the accident "often required him to actually roll out onto the safety netting."  The SHO also refers to the work site as a "hard to reach area."  Moreover, claimant was required to work in a "squatting position" while on the pier.

{¶ 54} As earlier noted, during his direct examination by his counsel at the September 12, 2012 hearing, claimant testified:

> Where I was working, I was underneath the bridge, the deck
> over my head and the fence underneath me. And the whole
> time you're on this, you're working on your hands and knees
> and you never stand straight up. So you're always crawling or
> on your knees doing the work performed, so, in my situation.
> The people around me, there really wasn't any work that was
> being performed right on either side of me. I was by myself.

{¶ 55} Clearly, claimant's hearing testimony provided some evidence to support the commission's finding that use of personal fall protection was impractical on the date of injury.

{¶ 56} Here, relator seems to suggest that the use of personal fall protection cannot be found impractical because means were available for claimant to "tie-off." Relator points to Mr. Duskey's hearing testimony that heavy duty C-clamps could have been used as "anchor points."  (Relator's reply brief, 4.)

{¶ 57} Relator's argument or suggestion misses the point.  The issue before the commission in determining whether use of personal protective equipment was impractical was not whether claimant could have actually tied-off and used his personal fall protection.  Relator is incorrectly arguing what was possible, not what was practical. Clearly, the availability of heavy duty C-clamps does not disprove that use of personal fall protection was impractical.

{¶ 58} In short, the commission did not abuse its discretion in determining that claimant's use of personal fall protection was impractical on the date of injury.

## Second Issue

{¶ 59} The second issue, as earlier noted, is whether the commission abused its discretion by not finding claimant unilaterally negligent in failing to "tie-off" using personal fall protection at the time of injury.

{¶ 60} The commission's determination that use of personal fall protection was "impractical" while claimant worked on the concrete pier at the time of the injury, in effect, determines the question of whether claimant can be unilaterally negligent in his failure to "tie-off" using personal fall protection. Clearly, under the pertinent safety rules, where it is impractical for the employee to use personal fall protection and the other safety devices listed at Ohio Adm.Code 4123:1-3-03(L)(1), the employee may rely upon an employer-provided safety net for his protection. Contrary to what may be suggested by relator, the safety rules at issue do not require the employee to use personal fall protection when the use of personal fall protection is impractical and he believes that a safety net has been provided for his safety.

{¶ 61} Moreover, the unilateral negligence defense is available only if the employer first complies with the applicable safety requirement. *Hirschvogel; State ex rel. Glunt Industries, Inc. v. Indus. Comm.,* 132 Ohio St.3d 78, 2012-Ohio-2125, ¶ 16. Here, as the commission held, relator did not first comply with the applicable safety requirement. That is, relator failed to satisfy the safety rule pertaining to safety nets, under circumstances where use of personal fall protection is impractical.

{¶ 62} However, relator argues that it did first comply with the applicable safety requirement when it undisputedly provided personal fall protection that claimant failed to use. (Relator's reply brief, 6.) Relator's argument is flawed because Ohio Adm.Code 4123:1-3-03(J)(1) requiring the employer to provide personal fall protection is not the applicable safety requirement regarding the unilateral negligence defense. The reason that Ohio Adm.Code 4123:1-3-03(J)(1) is not the applicable safety rule is because the use of personal fall protection was found to be impractical by the commission.

{¶ 63} Given the above analysis, the magistrate concludes that the commission did not abuse its discretion by not finding claimant unilaterally negligent in failing to "tie-off" using personal fall protection at the time of his injury.

### Third Issue

{¶ 64} The third issue is whether the specific safety rule, Ohio Adm.Code 4123:1-3-03(L)(3), prohibits the gap between the outermost projection of the work surface atop the concrete pier and the chain link fence (safety net)—the gap that claimant fell through at the time of the accident. This gap was found by the commission to measure between six inches and one foot. Relator, in effect, argues that the safety rule does not specifically prohibit the gap through which claimant fell. According to relator, the commission failed to identify any language in the rule that prohibits the gap, and that, in the absence of such language, the finding of a safety violation "imposes additional regulatory burdens on Armstrong Steel without notice and in contravention of strict construction against the applicability of specific safety requirements." (Relator's brief, 25.)

{¶ 65} Again, Ohio Adm.Code 4123:1-3-03(L)(3) states in part:

> Safety nets shall extend outward <u>from</u> the outermost projection of the work surface in accordance with the following table to this rule and shall be installed as close under the work surface as practical but in no case more than thirty feet below such work surface with the exception of bridge construction where only one level of nets is required. Nets shall be hung with sufficient clearance to prevent employee's contact with the surfaces or structures below.

(Emphasis added.)

{¶ 66} The following "Table" follows the above-quoted rule:

| Vertical distance from working level to horizontal plane of net | Minimum required horizontal distance of outer edge of net from the edge of the working surface. |
|---|---|
| Up to five feet | Eight feet |
| More than five feet up to ten feet | Ten feet |

| More than ten feet | Thirteen feet |
|---|---|

{¶ 67} Clearly, the "Table" does not address the issue regarding the gap. Clearly, the edge of the chain link fencing that created the gap is not the "outer edge of net" referred to in the table.

{¶ 68} The word "from" in the first sentence of Ohio Adm.Code 4123:1-3-03(L)(3) must be given meaning. Because safety nets shall extend outward _from_ the outermost projection of the work surface, a gap is not permitted. Relator's argument simply fails to give any effect or meaning to the word "from" in the first sentence of the rule. The rule need not specifically state that a gap is not allowed.

{¶ 69} Accordingly, the magistrate concludes that the gap is prohibited by the safety rule.

{¶ 70} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).